HENRY L. WOLFERS AND HELEN F. WOLFERS, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

NANCY A. MAZZONI, PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket Nos. 6772–75, 6773–75,      Filed March 21, 1978.

*David R. Andelman* and *William Eisen,* for the petitioners.
*John O. Tannenbaum,* for the respondent.

HALL, *Judge:* Respondent determined the following deficiencies in petitioners' Federal income tax for 1972:

Henry L. and Helen F. Wolfers ......... $37,453.80
Nancy A. Mazzoni ............................. 1,473.00

These cases were consolidated for trial, briefing, and opinion. Both cases concern deductions claimed by and on behalf of Henry L. Wolfers, Inc. (HLW), a subchapter S corporation. Other issues having been settled by the parties, the issues remaining are:

(1) Whether deductions claimed by HLW for its taxable year

ended February 29, 1972, for relocation expenses, professional fees, and excess rent are allowable under section 162[1] in light of HLW's receipt of reimbursement payments therefor under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (Relocation Act);

(2) Whether deductions for depreciation claimed by HLW are allowable for leasehold improvements and assets purchased with proceeds received under the Relocation Act; and

(3) Whether petitioners are entitled to investment tax credits for expenditures made by HLW for an air conditioning system and electrical installations.

## FINDINGS OF FACT

Most of the facts have been stipulated by the parties and are found accordingly.

At the time they filed their petitions, all petitioners were residents of Wellesley, Mass. At all relevant times petitioners were shareholders of Henry L. Wolfers, Inc. (HLW), a subchapter S corporation. HLW employed the accrual method of accounting and a fiscal year ending February 28 or 29. The common stock of HLW was owned as follows:

| Shareholder | Percentage of ownership |
| --- | --- |
| Henry L. Wolfers | 53.7 |
| Helen F. Wolfers | 36.3 |
| Nancy A. Mazzoni | 5.0 |
| Dorothy Nelkin | 5.0 |
| | 100.0 |

HLW is a wholesaler of electrical and lighting equipment, fixtures, and related items. On March 1, 1971 (the beginning of its fiscal year), HLW's place of business was at 556 Atlantic Avenue in Boston, Mass. HLW had a long-term lease on the premises which expired in April 1978. Prior to 1971 the Federal Reserve Bank of Boston (Bank) purchased the property at 556 Atlantic Avenue and notified HLW that it would have to vacate the premises. Pursuant to the provisions of the Uniform Relocation Assistance and Real Property Acquisition Policies

---

[1]All statutory references unless otherwise noted are to the Internal Revenue Code of 1954, as in effect in the year in issue.

Act of 1970 (Relocation Act), the Bank and HLW entered into negotiations to determine HLW's relocation expenses.

On December 16, 1970, counsel for HLW submitted to the Bank HLW's preliminary estimate of its relocation costs.[2] The

---

[2]The preliminary estimate submitted by HLW to the Bank was as follows:

| | | | | | |
|---|---|---|---|---|---|
| (1) | Increased costs of a new lease at another location. Estimated rent for a new location containing equivalent space and facilities $66,000 per year including heat and parking. Present cost of rent including heat and parking is $27,500. Difference at $38,500 per year for 7½ years (life of remaining lease with five year extension option) | | | | $288,750 |
| (2) | Expense of preparing new location including special wiring, display and professional planning. | | | | |
| | (a) | Electric wiring and special outlets for displaying and controlling 2,000 assorted hanging fixtures, wall fixtures and portable lamps at $32.00 each | | $64,000 | |
| | (b) | Fabrication and erection of suspended ceiling for 1,200 ceiling and hanging fixtures in a 7,000 foot ceiling area at $4.00 a foot | | 28,000 | |
| | (c) | Erecting partitions, painting, floor covering, wall treatment, and display treatment for showroom 7,000 feet at $6.00 a foot | | 42,000 | |
| | (d) | Erecting and painting partitions for offices and conference room, mechanical shop and shipping room 4,000 feet at $5.00 a foot | | 20,000 | |
| | (e) | Fabricating and erecting conveyor system for shipping and receiving | | 6,000 | |
| | (f) | Installation of stock bins, shelving and platforms in an area of 18,000 feet at $1.00 per foot | | 18,000 | |
| | (g) | Air conditioning installation in showroom and office area | | 20,000 | |
| | (h) | Installation of intercom system | | 4,000 | |
| | (i) | Exterior signs | | 5,000 | |
| | (j) | Professional planning fees by architects, designers and engineers | | 20,000 | 227,000 |
| | | | | | 515,750 |
| (3) | Loss in value of printed matter bearing current address—included stationery, business forms, lables, product catalogs and advertising matter | | | | 9,000 |
| (4) | Costs of advertising necessary to establish new location | | | | |
| | (a) | Preparation and mailing announcements to customers and suppliers | | 1,000 | |
| | (b) | Use of newspapers, trade magazines and other media over a four month period | | 30,000 | 31,000 |

preliminary estimate totaled $816,750 but did not include the actual cost of moving HLW to its new premises. The increased cost of a new lease was estimated at $288,750, on the basis of increased rentals of $38,500[3] per year for the remaining life of the lease. Other expenses, exclusive of the cost of preparing the new location, were estimated at $301,000. The remainder of the estimated relocation costs ($227,000) was for leasehold improvements necessary to recreate similar business conditions. In response to this preliminary estimate, the Bank indicated that it had no objection to a lump-sum settlement, but that it could not make a settlement "without reference to known factors derived out [of] a known relocation with a new lease."

In April 1971 HLW obtained a lease on new premises at 39 Sleeper Street in Boston. Subsequently the Bank and HLW agreed that the Bank would pay HLW $763,900 in full payment of the amount to which HLW was entitled under the Relocation Act. This lump sum included compensation for increased rent, new leasehold improvements, and the moving expenses necessary to relocate HLW at comparable business quarters. Proof of the new lease was the only condition imposed by the Bank prior to payment of the above amount. Payment was made on April 28, 1971. The amount of the payment greatly exceeded HLW's relocation costs.

---

(5) Expenses resulting from the loss of employees because of relocating and the necessity of hiring and training new employees. This item would vary depending on new location ........................................................................................... $10,000

(6) Overtime work required of personnel associated with moving effort estimated at 2,000 man hours at $8.00 ................................................................... 16,000

(7) Professional services including legal counselling and accounting fees needed in setting up new location ................................................................... 15,000

(8) Temporary loss of gross earnings during and immediately after moving .................................................... 120,000

(9) Permanent loss of earnings due to change in location. (Estimated for five year period.) .............................................................................. 100,000

Total ............... 816,750

Other items of expense with respect to which no estimates have been made:

    1. Personal time of officers of the corporation—loss of their time from regular business matters.

    2. Moving costs to be paid to moving company.

    3. Rent at two locations during transition period.

[3]The base annual rent at 556 Atlantic Avenue was $22,590; HLW estimated the annual cost of heating and parking to be $4,910. The estimated rent for a new location with equivalent facilities, including heat and parking, was $66,000. Accordingly, HLW estimated increased rent costs of $38,500 ($66,000 − ($22,590 + 4,910)).

Rather than relocate in equivalent quarters, HLW decided to expand its operation, using the funds provided by the Bank. Improvements made included, inter alia, doubling the floor space, tripling office space, and nearly tripling the number of electrical outlets for exhibiting merchandise. The base annual rent for HLW's new lease at 39 Sleeper Street was $57,600 (plus heat and parking). Other costs of relocation paid by HLW included moving expenses of $12,579 and leasehold improvements costing $197,389.31.[4] At its Atlantic Street location, HLW had made leasehold improvements costing $64,273, on which depreciation totaling $53,497 had been claimed in prior years. HLW purchased new machinery, furniture, carpeting, and fixtures costing $21,270, of which $20,970[5] was purchased to meet the requirements of the expanded facility. All the furniture, fixtures, and equipment which HLW had at its Atlantic Avenue premises were moved to Sleeper Street (except for one stove-sink-refrigerator combination). An air conditioning system was installed as a permanent improvement to the new business premises. HLW used the $763,900 it received from the Bank to pay for these expenses and improvements. HLW moved in October 1971, and began paying rent on its new lease as of October 1, 1971. HLW's obligation to pay rent under its old lease terminated April 30, 1971.

On its Small Business Corporation Income Tax Return (Form 1120S) for its taxable year ended February 29, 1972, HLW deducted $29,097[6] for rent, $12,579 for moving and relocation

---

[4] HLW made the following leasehold improvements:

| | |
|---|---|
| Improvements by lessor paid for by HLW | $55,000.00 |
| Payment to architect | 9,396.00 |
| Payments to electrical contractor | 50,330.43 |
| Payments to air conditioning contractor | 21,863.50 |
| Payments to general contractor | 60,209.38 |
| Payment to Sleeper Street Trust | 590.00 |
| | 197,389.31 |

[5] The following were the expenditures made for the expanded facilities:

| | |
|---|---|
| Furniture | $4,550 |
| Equipment | 6,398 |
| Carpeting | 10,022 |
| | 20,970 |

[6] HLW paid only $29,097 rent in 1971 (pursuant to its agreement with the Bank, it did not have to pay rent for April through October 1971) as follows:

| | |
|---|---|
| Rent for 556 Atlantic Avenue, March and April 1971 (2/12 x $22,590) | $3,765 |
| Rent for 39 Sleeper Street, October 1971 through January 1972 (4/12 x $57,600) | 19,200 |
| Heat (included in rent deduction by HLW) | 6,132 |
| | 29,097 |

expenses, $10,565 for professional services, and depreciation of $14,302, plus additional first-year depreciation of $2,000. In addition, on their 1972 returns petitioners Henry and Helen Wolfers claimed an investment tax credit for investments made by HLW of $4,017, and petitioner Nancy Mazzoni claimed an investment tax credit for investments made by HLW of $223. In his statutory notices, respondent determined that HLW was not entitled to the deductions for any of the moving and relocation expenses and disallowed $14,171 of the claimed rental deduction, $5,398 of the deduction for professional services, $12,745 of the depreciation deduction,[7] and the $2,000 for additional first-year depreciation. In addition, respondent determined that petitioners were not entitled to any of their claimed investment tax credits.

## OPINION

In this case we must determine the tax consequences of the receipt and disbursement of a lump sum award received by Henry L. Wolfers, Inc. (HLW), a subchapter S corporation, from the Federal Reserve Bank of Boston (Bank) pursuant to the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, Pub. L. 91–646, 84 Stat. 1894 (1971) (Relocation Act).

The Relocation Act was the culmination of extensive efforts in Congress to provide uniform, fair treatment to individuals and businesses displaced by Federal or federally assisted programs. In relevant part, the Relocation Act provides:

Sec. 202. (a) Whenever the acquisition of real property for a program or project undertaken by the Federal agency in any State will result in the displacement of any person on or after the effective date of this Act, the head of such agency shall make a payment to any displaced person, upon proper application as approved by such agency head, for—

(1) actual reasonable expenses in moving himself, his family, business, farm operation, or other personal property;

---

[7]Respondent obtained this figure ($12,745) by disallowing depreciation for all expenditures made in 1971 for new furniture or equipment and leasehold improvements made in connection with the move to Sleeper Street. Depreciation of $1,557 ($919 furniture and $638 machinery) for furniture and machinery and $1,891 for leasehold improvements was allowed; this depreciation reflects HLW's basis in assets and leasehold improvements it had at its Atlantic Avenue location.

(2) actual direct losses of tangible personal property as a result of moving or discontinuing a business or farm operation, but not to exceed an amount equal to the reasonable expenses that would have been required to relocate such property, as determined by the head of the agency; and

(3) actual reasonable expenses in searching for a replacement business or farm.

We glean the purpose of the Relocation Act from both its text and its legislative history. Section 201 of the Relocation Act, entitled "Declaration of Policy," states:

The purpose of this title is to establish a uniform policy for the fair and equitable treatment of persons displaced as a result of Federal and federally assisted programs in order that such persons *shall not suffer disproportionate injuries* as a result of programs designed for the benefit of the public as a whole. [Emphasis added.]

From this it can be inferred that Congress desired to minimize the loss, if any, suffered as a result of relocation. Further support for this conclusion can be found in the committee reports which accompanied the Relocation Act. The Report of the House Public Works Committee specifically notes that the purpose of the Relocation Act is to find a suitable "replacement" for persons and businesses forced to relocate. H. Rept. 91–1656, U.S. Code Cong. & Adm. News 5852 (1970).

The most straight-forward explanation of the purpose of the Relocation Act was presented on the floor of the Senate. In his speech supporting passage of the Relocation Act (there were no speeches in opposition), Senator Mundt, who was one of the members of the Senate Government Operations Committee which had considered the Relocation Act, stated that "this bill has one basic purpose and that is to make these people so displaced 'economically whole.'" 115 Cong. Rec. 31534 (1969). We conclude that Congress intended by this Act to place displaced individuals and businesses in the same position they would have been in had they not been forced by the Federal Government to relocate.

The Relocation Act provides for the tax treatment of payments received under the Act as follows:

Sec. 216. No payment received under this title shall be considered as income for the purposes of the Internal Revenue Code of 1954; or for the purposes of determining the eligibility or the extent of eligibility of any person for assistance under the Social Security Act or any other Federal law.

Petitioners assert on brief that the Congressional intent

embodied in this section must have been to give dislocated persons a special tax benefit; otherwise, petitioners contend, Congress would have used language in section 216 of the Relocation Act to provide nonrecognition of income (compare section 1034 of the Internal Revenue Code with section 216 of the Act). We are not persuaded by this argument. In the first place, the Relocation Act was not drafted by the Committees in Congress which normally draft tax legislation. Secondly, the language used in the Relocation Act is itself inconclusive, since not only did Congress not use nonrecognition language, it also did not use the language normally associated with exclusion of items from gross income (compare Code sections 101–123 with section 216 of the Act). Finally, it is clear from a discussion on the House floor that the drafters of the Relocation Act did not give much consideration to its tax consequences:

MR. HALL: * * * Does this bill contain any manner or means of handling capital gains where there was very little markup because of inheritance or otherwise, or is it all handled by protection of those who would reinvest, who hold the profits for business, or who buy property held by a former owner for investment?

MR. EDMONSON: I share the interest of the gentleman in that particular question, and it is my impression that the committee feeling was that we did not have the jurisdiction to get into the tax field with regard to this particular bill. We were not able to take care of that particular item for that reason. [116 Cong. Rec. 40169 (1970).]

Given the brief and unclear provisions in the Relocation Act concerning taxation of payments received under the Act, we now turn to the specific tax issues presented in this case.

In 1970 the property in which HLW was located at 556 Atlantic Avenue in Boston was acquired by the Federal Reserve Bank of Boston. The Bank decided to terminate HLW's long-term lease and relocate HLW pursuant to the provisions of the Relocation Act. Accordingly, negotiations were initiated, resulting in a lump-sum payment to HLW by the Bank of $763,900. The only condition imposed by the Bank prior to payment to HLW was that HLW enter into a new lease. The lump-sum payment HLW received from the Bank included the increased rent and cost of furniture, equipment, and leasehold improvements for comparable business quarters, as well as moving costs and fees associated therewith. Subsequent to its receipt of payment, HLW moved to its present location on Sleeper Street in Boston.

HLW estimated its additional rent at Sleeper Street over and above the rent at Atlantic Avenue for the duration of its lease to be $288,750. Its former annual rent was $22,590 (plus $4,910 heating and parking). Its new annual rent for greatly expanded quarters was $57,600 plus heating and parking. HLW moved in October 1971 when its lease had 6½ years to run (including an option to extend). Obviously its estimated additional rent was very generous. HLW had estimated $227,000 for leasehold improvements to make it whole. It spent about $219,000 for leasehold improvements, machinery, furniture, and carpeting in its expanded facility. Again its estimate was generous. HLW's actual moving expenses were only $12,579, although it moved all its furniture, fixtures, and equipment (except for a stove-sink-refrigerator combination) from the old location. Thus HLW has over $520,000 ($763,900 − ($12,579 + $219,000)) available after moving expenses and leasehold improvements, machinery, furniture, and carpeting to pay excess rent plus any other expenses of relocating. Clearly HLW got a windfall to which it was not entitled under the Relocation Act. Under the Relocation Act the entire lump sum awarded was not to "be considered as income" when received. The issues raised here are: (1) Is HLW entitled to deductions for moving expenses and excess rent during the year in issue, and (2) is HLW entitled to depreciation deductions on depreciable property purchased with the lump-sum award? There is the further question of whether the shareholders are entitled to an investment tax credit for property purchased with the award.

### 1. *Deduction for Increased Rent, Moving Costs, and Professional Fees Incurred in Relocating*

The first issue before us is whether HLW is entitled to deduct its payments for increased rent, moving costs, and professional fees incurred in its relocation.[8] Generally, a corporation's payments for rent, moving expenses, and professional fees in connection with its relocation are deductible under section 162. Respondent contends, however, that in this case the deductions are not allowable either because these were reimbursed expenses or because these expenses were allocable to exempt income

---

[8]Prior to its relocation HLW paid annual rent of $22,590; after relocation the rent was $57,600. The only issue before us concerns the increased rent subsequent to relocation.

(reimbursement payments) and hence nondeductible under section 265. Petitioners, on the other hand, contend that all the expenditures are deductible under section 162 and that any conclusion to the contrary would defeat the purposes of the Relocation Act by making taxable payments received thereunder. In the alternative, petitioners contend that three-fourths of the expenditures are deductible since only one-fourth of the expense represents reimbursed expenses while three-fourths represents the costs of the expansion of HLW's business.

Subsequent to the trial in this case and after the parties submitted their briefs, we decided a case involving deductibility of moving expenses reimbursed pursuant to the Relocation Act. In *Charles Baloian Co. v. Commissioner*, 68 T.C. 620 (1977), we noted the general rule that moving expenses incurred by a corporation are deductible. 68 T.C. at 625. However, we held that the moving expenses in issue which were reimbursed pursuant to the Relocation Act were not deductible because they constituted expenses to which the taxpayer had a fixed right of reimbursement at the time the expenses were incurred. See *Glendinning, McLeish & Co. v. Commissioner*, 24 B.T.A. 518 (1931), affd. 61 F.2d 950 (2d Cir. 1932); *Hearn v. Commissioner*, 36 T.C. 672 (1961). Our decision in *Charles Baloian Co.* is controlling in this case; here petitioner had already received the reimbursement before the expenses were incurred. Although *Charles Baloian Co.* concerned only moving expenses, its rationale is applicable in this case to HLW's moving expenses and professional fees for obtaining a new lease which were paid by the Bank.[9]

The deductibility of HLW's increased rent is also governed by *Charles Baloian Co.* This issue concerns two categories of rent: (1) Increased rent necessary to obtain a business location *comparable* to HLW's Atlantic Avenue location, and (2) increased rent attributable to the *expansion* of HLW. As part of its move, HLW greatly expanded it business location; floor space doubled, office space tripled, etc. The Bank's payments for rent in fact sufficed to cover the full increased rent, whether or not such generosity comported with the Relocation Act's intent. Applying the rationale of *Charles Baloian Co.*, it is clear that the

---

[9]Petitioners contend that a portion of the moving expenses and professional fees is deductible on the grounds that these expenses were incurred for the expansion of HLW's facilities. We disagree. The moving fees were paid solely for HLW's relocation, and the professional fees (which were for obtaining a new lease) would have been incurred whether or not HLW expanded.

portion of HLW's increased rent which represents the increased cost after relocation to *comparable* facilities was reimbursed by the Bank and is, therefore, not deductible. But how should we treat the increased rent attributable to HLW's *expansion*?

Petitioners contend that the portion of their increased rent attributable to the expansion of the business is fully deductible; respondent contends the rent is nondeductible on the grounds either that this was a reimbursed expense or that the expenditures are allocable to tax-exempt income (which would render the expenditures nondeductible under section 265). We agree with respondent on the former ground, hence need not reach the latter. The amount HLW received for excess rent was sufficient to cover all rent in excess of the prior rent for the term of the prior lease, including the term of the renewal option. Since the entire excess rent was in fact reimbursed, under *Charles Baloian Co.* HLW is not entitled to a deduction for the excess rent.

## 2. *Depreciation and Investment Tax Credit*

We must next determine the proper treatment of those amounts received under the Relocation Act and not expended on currently deductible items. The Relocation Act's only guidance is its rather cryptic stricture that payments thereunder are not to "be considered as income." Respondent and petitioner are in agreement that this means the payments are "tax exempt." It is petitioners' position that the necessary implication of tax exemption is that the tax consequences of expenditures of such exempt funds should be the same as the consequences of spending funds the receipt of which was exempt under any other statutory exemption provision, for example, exempt interest on municipal bonds. When exempt interest is expended on the purchase of a depreciable asset for use in a taxpayer's trade or business, depreciation deductions and the tax investment credit are of course as fully available as where such a purchase is financed through ordinary taxable income. Respondent, however, focusing on the purpose of the Relocation Act to make recipients whole without granting them a windfall, contends for a narrower interpretation of tax exemption. He would trace the exempt proceeds to the assets they purchased and deny investment tax credits, depreciation deductions, and (presumably) a cost basis at the ultimate disposition of these assets.

We have already held that the tax exemption under the

Relocation Act does not override the doctrine that specifically reimbursed expenses are nondeductible. Respondent relies upon a corresponding doctrine which would, where applicable, deny the taxpayers a basis in assets acquired by a corporation through contributions by a nonshareholder. In *Detroit Edison Co. v. Commissioner*, 319 U.S. 98 (1943), a utility company's customers made tax-exempt payments with which the utility constructed facilities to service such customers. The Supreme Court held that costs so financed were excludable from the utility's basis for depreciation. Respondent relies upon *Detroit Edison* as authority for denying to HLW here a basis for depreciation and investment credit purposes in those costs defrayed by HLW's exempt income under the Relocation Act.

*Detroit Edison Co. v. Commissioner, supra,* is not cited nor discussed by petitioner, and neither party cites us to two later Supreme Court decisions in the area nor to the apparently relevant statutory provisions. In *Brown Shoe Co. v. Commissioner*, 339 U.S. 583 (1950), the Supreme Court determined that a corporate taxpayer could include in his basis for purposes of depreciation the cost of production facilities contributed to it, or paid for out of tax-exempt funds contributed to it, by community groups desiring to induce the taxpayer to locate plants locally. The community groups' payments were held to be "contributions to capital" and therefore includable in the basis of assets acquired thereby. In 1954, Congress elected to change this result by enactment of section 362(c),[10] under which nonshareholder

---

[10]In relevant part, sec. 362 provides:

(a) PROPERTY ACQUIRED BY ISSUANCE OF STOCK OR AS PAID-IN SURPLUS.—If property was acquired on or after June 22, 1954, by a corporation—

\*     \*     .     \*     \*     \*     \*     \*

(2) as paid-in surplus or as a contribution to capital,

then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer.

\*     \*     \*     \*     \*     \*     \*

(c) SPECIAL RULE FOR CERTAIN CONTRIBUTIONS TO CAPITAL.—

(1) PROPERTY OTHER THAN MONEY.—Notwithstanding subsection (a)(2), if property other than money—

(A) is acquired by a corporation, on or after June 22, 1954, as a contribution to capital, and

(B) is not contributed by a shareholder as such, then the basis of such property shall be zero.

(2) MONEY.—Notwithstanding subsection (a)(2), if money—

(A) is received by a corporation, on or after June 22, 1954, as a contribution to capital, and

(B) is not contributed by a shareholder as such,

then the basis of any property acquired with such money during the 12-month period beginning on the day the contribution is received shall be reduced by the amount of such contribution. The excess (if

cash contributions to capital must be excluded from the basis of assets purchased therewith within 12 months, under tracing rules set forth in sec. 1.362–2, Income Tax Regs. See *Veterans Foundation v. Commissioner*, 317 F.2d 456, 458 (10th Cir. 1963). Thereafter the Supreme Court decided a case arising under the 1939 Code, *United States v. Chicago, Burlington & Quincy RR Co.*, 412 U.S. 401 (1973). In this case, the Court held that subsidies received by a railroad corporation for costs of constructing highway undercrossings and overcrossings and other safety improvements did not constitute capital contributions within the *Detroit Edison* doctrine and did not create a basis for depreciation. The Court distinguished *Detroit Edison* from *Brown Shoe* on the basis that *Brown Shoe* involved a contribution to capital, while *Detroit Edison* did not. The Court stated:

> We can distill from these two cases some of the characteristics of a nonshareholder contribution to capital under the Internal Revenue Code. It certainly must become a permanent part of the transferee's working capital structure. It may not be compensation, such as a direct payment for a specific, quantifiable service provided for the transferor by the transferee. It must be bargained for. The asset transferred foreseeably must result in benefit to the transferee in an amount commensurate with its value. And the asset ordinarily, if not always, will be employed in or contribute to the production of additional income and its value assured in that respect. [412 U.S. 413.]

Applying these tests, the Supreme Court found that the subsidies in question were not contributions to capital and that they therefore could not add to the taxpayer-railroad's basis.

In view of the enactment of section 362(c), the distinction drawn in *United States v. Chicago, Burlington & Quincy RR Co.* seems academic for present purposes. While it appears that payments under the Relocation Act to petitioner do fill the Supreme Court's conceptions in *Brown Shoe* of a nonshareholder contribution to capital, section 362(c) precludes their inclusion in HLW's basis even on that assumption. Petitioner's argument to the contrary, that this would demote the statutorily-conferred tax exemption to a mere tax deferral, is essentially question-

---

any) of the amount of such contribution over the amount of the reduction under the preceding sentence shall be applied to the reduction (as of the last day of the period specified in the preceding sentence) of the basis of any other property held by the taxpayer. The particular properties to which the reductions required by this paragraph shall be allocated shall be determined under regulations prescribed by the Secretary or his delegate.

begging. The fact that an item of receipts is tax exempt by no means guarantees the taxpayer a basis in any item purchased with such receipts. Section 118 excludes corporate capital contributions from gross income, but Congress has elected in section 362(c) to deny a basis to the recipient corporation in such contributions or property purchased therewith.

In this case, the tax-exempt status of the receipts in question stems from the provisions of the Relocation Act rather than from section 118. (We need not decide whether section 118 would have applied without regard to the Relocation Act.) The statutory source of tax-exempt status does not, however, determine the basis question. We hold that section 362(c) is applicable here and that petitioner's basis must be determined under the rules of section 1.362–2, Income Tax Regs.

We have several reasons for this holding. In the first place, the Supreme Court has characterized as "anomalous" a situation in which a taxpayer may first exclude from income an asset delivered to his business as a subsidy from a third party and then may deduct depreciation on the asset so received. *United States v. Chicago, Burlington & Quincy RR Co.,* 412 U.S. at 407. The anomalous nature of this situation led Congress to legislative correction in section 362(c). We would need clearer congressional guidance before reinstating the same anomaly in an only slightly different context. Secondly, we find the payments in question to fall literally within the wording of section 362(c) as "contributions to capital," particularly as that term is explicated in the foregoing quotation from *United States v. Chicago, Burlington & Quincy RR Co.* Third, even were we writing on a clean slate, we would find it difficult logically to support a conclusion under which the deductibility vel non of a reimbursed item depended solely on whether it represented a reimbursed expense (deductible, if at all, currently) or a reimbursed, depreciable item (deductible ratably over its useful life). The speed with which the deduction in question is taken should not determine whether full reimbursement by a third party precludes the deduction. Hence, it would be difficult to defend a holding denying the deduction to a reimbursed expense under *Charles Baloian Co.,* but allowing it through the depreciation account to a reimbursed capital item. Fourth, we believe that the purposes of the Relocation Act are better served by our holding than they would be under petitioners' reading. The Relocation Act was intended

to make relocated persons whole, not to furnish them with a federally-subsidized windfall under which their net worth would be greater than it would have been in the absence of the relocation. If the reimbursed costs of replacement property exceed the adjusted basis of the asset it replaces, and if the taxpayer is allowed to deduct depreciation on such excess, his taxable income will thereby be lower and his ultimate net worth higher than it would have been had the relocation never occurred. HLW in this case has already enjoyed one windfall by receiving amounts under the Relocation Act considerably in excess of its true relocation costs, a matter with which we, of course, have no concern. However, we find no compulsion in the Relocation Act to reward it with a further windfall by exempting it from the provisions of section 362(c) or to resurrect the "anomaly" that that subsection puts to rest.

Petitioners place considerable reliance on Rev. Rul. 74–205, 1974–1 C.B. 20. In this Ruling, the Commissioner holds that nontaxable "replacement housing payments" under the Relocation Act may nonetheless be added to a homeowner's basis. Little note need be taken of this Ruling, however. In the first place, like any other ruling, it does not necessarily state the law but is merely the administrative interpretation thereof by the Commissioner.[11]

Secondly, while we need not now decide whether we would follow the Ruling, it arises in a nonbusiness, noncorporate context, and did not deal with section 362(c). Finally, its result appears questionable, since it construes the Relocation Act to provide a windfall to affected taxpayers rather than merely to make them whole—reinstating in its area the kind of "anomaly" created by *Brown Shoe* and eliminated by Congress in section 362(c).

We hold, accordingly, that the only basis HLW has for

---

[11]As the Senate Finance Committee recently stated in a press release (dated Feb. 3, 1978) concerning modifications made in H.R. 6715, Technical Corrections Act of 1977:

The Tax Relief Act of 1976 established a negligence penalty of $100 per return for income tax return preparers who prepare a return containing an understatement of tax liability due to the "negligent or intentional disregard of rules and regulations" of the Internal Revenue Service. The courts have held that a revenue ruling does not have the status of regulations or provisions of the Code and is not binding on the Secretary of the Treasury or the courts.

The Committee approved an amendment to require that in no case is the disregard of an Internal Revenue Service ruling to constitute a negligent or intentional disregard of Internal Revenue Service rules or regulations for purposes of the negligence penalty.

depreciation purposes in its new improvements is the basis it had in the assets it lost. No new qualified investment, therefore, was made for investment tax credit purposes. Sec. 46(c)(1). Accordingly, we need not reach the issue whether certain new assets constitute section 38 property.

*Decisions will be entered under Rule 155.*