PETER ZUANICH AND MARY ANN ZUANICH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 594–78.     Filed August 20, 1981.

Peter Zuanich, pro se.
*Matthew W. Stanley*, for the respondent.

CHABOT, *Judge*: Respondent determined a deficiency in Federal individual income tax against petitioners for 1975 in the amount of $7,736.85. The issues for decision are as follows:

(1) Whether respondent should be equitably estopped from disallowing a portion of petitioners' claimed foreign tax credit because of petitioner-husband's asserted reliance on advice understood by petitioner-husband as having been given to him by respondent's agents; and

(2) Whether "basis" for purposes of the investment credit under section 38[1] is greater than "basis" for depreciation and capital gain purposes, in the case of property purchased with tax-deferred funds withdrawn from petitioner-husband's capital construction fund ordinary income account established under the Merchant Marine Act, 1936.[2]

### FINDINGS OF FACT

Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference.

When the petition in this case was filed, petitioners Peter Zuanich (hereinafter sometimes referred to as Zuanich) and Mary Ann Zuanich, husband and wife, resided in Bellingham, Wash.

---

[1]Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the taxable year in issue.

[2]In his trial memorandum, respondent stated that he "may argue on brief that if the Court should find that petitioners are entitled to an investment credit, the credit should be limited to 7%." Respondent did not make any such argument at the trial or in his post-trial brief, and so we assume he concedes that, if the investment credit is available, then the appropriate rate is 10 percent. (The increase in the investment credit from 7 percent to 10 percent applied after Jan. 21, 1975 (sec. 46(a)(1)(D)).)

## I. Foreign Tax Credit

During 1975: Zuanich owned a majority of the stock of Armstrong Paper Products, Ltd. (hereinafter referred to as Armstrong), a corporation formed and incorporated under the laws of Canada; Armstrong had an unknown amount of income which resulted in Armstrong's tax payment to the Canadian Government in 1975 of at least $6,986.94; Zuanich received $9,966.60 in interest, $4,500 in rents, and $14,396.95 in capital gain, as to all of which tax of $5,768.90 was withheld and paid over to the Canadian Government; and Zuanich received $3,500 in director's fees from Armstrong on which no tax was paid to the Canadian Government.

At some time before the filing of petitioners' 1975 return, Zuanich spoke with several of respondent's revenue agents who worked in Bellingham, Wash., about the tax consequences of his dealings with Armstrong. Zuanich understood those people to say that he would be entitled to a foreign tax credit for the $6,986.94 in taxes paid by Armstrong to the Canadian Government. He structured his business dealings in reliance on that understanding.

On Form 1116 (Computation of Foreign Tax Credit) attached to petitioners' 1975 joint Federal individual income tax return, petitioners claimed a foreign tax credit of $12,755.84. Of this amount, respondent allowed the $5,768.90 withheld amount and disallowed the remaining $6,986.94.

## II. Investment Credit

During 1975, Zuanich was active as a commercial fisherman and wastepaper dealer; he conducted these businesses under the name "Puget Sound Salvage Co."

In 1974, as a commercial fisherman, Zuanich deposited $30,000 into a "capital construction fund ordinary income account" under section 607(e) of the Merchant Marine Act, 1936. For tax purposes, Zuanich deducted the $30,000 from his gross fishing receipts for 1974.

In 1975, Zuanich made a "qualified withdrawal"[3] of $7,616.58 from the account and purchased a new hydraulic

---

[3] Sec. 607(f), Merchant Marine Act, 1936.

fishing reel assembly (hereinafter referred to as the reel) for his commercial fishing boat. The reel, which he placed into service in the spring of 1975, was used to retrieve a fishing net. The reel had a useful life of 7 or more years when placed into service.

Zuanich did not add the purchase price of the reel to his adjusted cost basis in his commercial fishing boat for purposes of claiming depreciation. He did claim an investment credit of $761.66 with respect to the reel; respondent disallowed this credit.

## OPINION

### I. Foreign Tax Credit

Petitioners have no *legal* right to the foreign tax credit under sections 33[4] and 901[5] on account of Armstrong's payment of the Canadian tax. *Biddle v. Commissioner*, 302 U.S. 573 (1938); sec. 1.901–2(a), Income Tax Regs. (26 C.F.R. sec. 4.901–2(a)(1), Temporary Income Tax Regs.). See *Gleason Works v. Commissioner*, 58 T.C. 464, 474 (1972).

Petitioners do not claim that they are legally entitled to the foreign tax credit under sections 33 and 901; instead, they make an equitable claim that they relied to their detriment on respondent's agents' advice and respondent should be estopped

---

[4]SEC. 33. TAXES OF FOREIGN COUNTRIES AND POSSESSIONS OF THE UNITED STATES.

The amount of taxes imposed by foreign countries and possessions of the United States shall be allowed as a credit against the tax imposed by this chapter to the extent provided in section 901.

(The subsequent amendment of this provision by sec. 1051(a), Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1643, does not affect the instant case.)

[5]Sec. 901 provides, in pertinent part, as follows:

(a) ALLOWANCE OF CREDIT.—If the taxpayer chooses to have the benefits of this subpart, the tax imposed by this chapter shall, subject to the applicable limitation of section 904, be credited with the amounts provided in the applicable paragraph of subsection (b) plus, in the case of a corporation, the taxes deemed to have been paid under sections 902 and 960. * * *

(b) AMOUNT ALLOWED.—Subject to the applicable limitation of section 904, the following amounts shall be allowed as the credit under subsection (a):

(1) CITIZENS AND DOMESTIC CORPORATIONS.—In the case of a citizen of the United States and of a domestic corporation, the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States; * * *

(The subsequent amendments of this provision by sec. 1031(b)(1), Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1622, do not affect the instant case.)

or otherwise prohibited from disallowing the claimed credit. Petitioners describe their detrimental reliance as follows:

(1) Under the advice they received from respondent's agents (that petitioners would be allowed a foreign tax credit for income tax paid to Canada by Armstrong), petitioners would have netted about $10,500 after tax from Armstrong.

(2) Because of this advice, Zuanich did not cause Armstrong to pay out its profit to Zuanich as director's fees. If Zuanich would have caused the payout, petitioners say, they would have netted about $7,000 after tax from Armstrong.

(3) Under respondent's current position, petitioners would net about $3,500 after tax from Armstrong.

Respondent argues that (1) petitioners are not entitled to the foreign tax credit under sections 33 and 901 for amounts paid by Armstrong, (2) there is a factual dispute as to what Zuanich and respondent's personnel said to each other, and (3) even had respondent's personnel given erroneous advice to Zuanich, that would not result in petitioners' being entitled to the credit.

We agree with respondent.

Firstly, petitioners have failed to prove the facts which would give rise to an estoppel. The record fails to show that Zuanich completely explained the relevant facts to the revenue agents and fails to show that they definitively advised him as to the tax consequences of structuring the transaction as he did. At most, there appears to have been a discussion and a misunderstanding. On this record, we would not invoke the doctrine of equitable estoppel, even were we allowed to do so. See *Boulez v. Commissioner*, 76 T.C. 209, 214–215 (1981); *Underwood v. Commissioner*, 63 T.C. 468 (1975), affd. 535 F.2d 309 (5th Cir. 1976); *Schwartz v. Commissioner*, 40 T.C. 191, 193 (1963).

Secondly, even were we able to find that respondent's agents misled Zuanich about the tax consequences of structuring the transaction as he did, we would be unable to grant petitioners the relief they ask. The doctrine of equitable estoppel does not bar respondent from correcting a mistake of law. *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180 (1957).

Petitioners cite several cases in support of their argument that "an estoppel in fact will run against the government on tax matters." The matter about which petitioners claim to

have been misled appears to be a matter of law. The cases cited by petitioners all predate the opinion of the Supreme Court in *Automobile Club of Michigan v. Commissioner, supra* . These cases do not detract from the sweeping rule enunciated therein, that "The doctrine of equitable estoppel is not a bar to the correction by the Commissioner of a mistake of law"[6] (353 U.S. at 183), nor from the elaboration in *Dixon v. United States*, 381 U.S. 68, 73 (1965), that "He may do so even where a taxpayer may have relied to his detriment on the Commissioner's mistake."

Petitioners cite *Schuster v. Commissioner*, 312 F.2d 311, 316 (9th Cir. 1962), affg. in part and revg. in part 32 T.C. 998 (1959), and *First Western Bank & Trust Co. v. Commissioner*, 32 T.C. 1017 (1959), in conceding a point. The only aspect of *Schuster* which might arguably have supported petitioners' position relates to a governmental determination forcing a disinterested third party to take an irreversible action. That is not the situation in the instant case. *Schuster* is distinguishable. See *Puls v. United States*, 387 F. Supp. 760, 764 (N.D. Cal. 1974).

On this issue, we hold for respondent.

## II. Investment Credit

Petitioners argue that Zuanich's investment in the reel "qualifies for the investment tax credit irrespective of the source of the funds invested." Respondent argues that petitioners are entitled to no investment credit because Zuanich made no "qualified investment" in the reel, since all the funds used to purchase the reel were withdrawn tax free from Zuanich's ordinary income account under the Merchant Marine Act, 1936.

We agree with respondent.

Under section 607(g)(2) of the Merchant Marine Act, 1936 (46 U.S.C. 1177(g)(2)),[7] Zuanich's basis in the reel is reduced to the extent that the reel was purchased with funds he withdrew

---

[6]Indeed, in *Automobile Club*, the Supreme Court specifically disapproved one of the cases now relied on by petitioners—*Stockstrom v. Commissioner*, 190 F.2d 283 (D.C. Cir. 1951)—to the extent that *Stockstrom* held to the contrary of the statement quoted in the text, *supra*.

[7]Unless indicated otherwise, all references to "section ____ , MMA" are references to sections of the Merchant Marine Act, 1936 (46 U.S.C. sec. 1101, et seq.), as in effect for the taxable year in issue.

tax free from his capital construction fund ordinary income account (hereinafter referred to as ordinary income account).[8] In this case, the investment credit is 10 percent of Zuanich's basis in the reel. Since all the funds Zuanich used to buy the reel had been withdrawn by him tax free from his ordinary income account, his basis in the reel is zero. Consequently, his investment credit is zero.

We have found no evidence that the Congress focused specifically on the interrelationships between section 607, MMA, and the investment credit before 1976. However, the Congress on several occasions has focused on the relationship between the investment credit and eligibility for special tax benefits (see text at notes 14–16 *infra*); sometimes it has allowed both, sometimes it has disallowed the investment credit if the special tax benefit is claimed, and sometimes it has imposed restrictions on the investment credit if the special tax benefit is claimed. On several occasions, the Congress first followed one course of action and then another, with respect to the same special benefit.

We are convinced that the Congress intended to provide an indefinite tax deferral with respect to funds remaining in Zuanich's capital construction fund or withdrawn for qualified purposes;[9] our conclusion herein is consistent with this intent. Similarly, we are convinced that the Congress intended tax basis to be a critical element in calculating the investment

---

[8]This reduction is not by way of a recapture, it is a prohibition on multiple tax benefits. The tax benefit under the Merchant Marine Act, 1936, is the tax deferral resulting from deduction or exclusion of otherwise taxable ordinary income or capital gain items. This benefit lasts so long as the funds remain dedicated to tax-favored shipping purposes. See H. Rept. 91–1073, at 50, 54, 55–56, and S. Rept. 91–1080, at 47, 51, 52–53, both to accompany H.R. 15424, Merchant Marine Act of 1970, Pub. L. 91–469, 84 Stat. 1018. See generally U.S. Code Cong. & Adm. News 4188, et seq. (1970). In effect, Zuanich has been able to deduct his investment in the reel even before "up front" expensing, that is, he deducted his investment before he purchased the reel. Recapture could occur if Zuanich sells the reel without depositing the proceeds of the sale in his capital construction fund. (See note 9 *infra*.)

[9]If the taxpayer later disposes of any vessel, etc., whose basis was reduced under these rules, then to the extent of any gain on the disposition of the vessel, etc., the reduction in basis is to be taxed as ordinary income in the year the property was disposed of. However, if the taxpayer redeposits the proceeds of the disposition of the property in the fund, this will further postpone the taxation of the amount involved. Joint regulations are to provide the conditions and procedures under which the taxpayer may make the redeposit in the fund and are to provide for the allocation of the redeposit to the appropriate account. (H. Rept. 91–1073, at 54; S. Rept. 91–1080, at 51.)

credit (where it intended otherwise, it specifically so provided); our conclusion herein is also consistent with this intent.

In sum, the result we reach—zero investment credit—is commanded by the language used by the Congress in the statute, and it conflicts with neither the legislative history nor the Congress' policy.

The remainder of the opinion sets forth the statutory framework of the investment credit (A.1.), and the Merchant Marine Act (A.2.); it analyzes the statutes (B.1.), and the cases (B.2.); it deals with the Court of Claims opinions that are contrary (C.); it then holds that section 46(g) has no effect on the instant case (D.).

## A. Statutory Framework

### 1. Investment Credit

Section 38[10] provides for the investment credit. Section 46(a)(1)(A)[11] provides that, in general, the amount of the credit is 10 percent of the "qualified investment." Section 46(c)(1)[12] provides that the qualified investment is the basis of new section 38 property,[13] times a percentage (the percentage to be determined under section 46(c)(2)).

---

[10]SEC. 38. INVESTMENT IN CERTAIN DEPRECIABLE PROPERTY.

(a) GENERAL RULE.—There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part [secs. 46–50].

(b) REGULATIONS.—The Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this section and subpart B.

(The subsequent amendment of subsec. (b) by sec. 1906(b)(13) [sic] (A), Tax Reform Act of 1976 (Pub. L. 94–455, 90 Stat. 1834), does not affect the instant case.)

[11]SEC. 46. AMOUNT OF CREDIT.

(a) DETERMINATION OF AMOUNT.—

(1) GENERAL RULE.—

(A) TEN PERCENT CREDIT.—Except as otherwise provided in this paragraph, in the case of a property described in subparagraph (D), the amount of the credit allowed by section 38 for the taxable year shall be an amount equal to 10 percent of the qualified investment (as determined under subsections (c) and (d)).

(The subsequent revision of this provision by sec. 802(a)(2), Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1581, does not affect the instant case.)

[12]SEC. 46. AMOUNT OF CREDIT.

(c) QUALIFIED INVESTMENT.—

(1) IN GENERAL.—For purposes of this subpart, the term "qualified investment" means, with respect to any taxable year, the aggregate of—

(A) the applicable percentage of the basis of each new section 38 property (as defined in section 48(b)) placed in service by the taxpayer during such taxable year, plus

(B) the applicable percentage of the cost of each used section 38 property (as defined in section 48(c)(1)) placed in service by the taxpayer during such taxable year.

[13]In the case of "used section 38 property," the qualified investment is the product of "cost" and the percentage determined under sec. 46(c)(2). Sec. 48(c)(3)(B) provides as follows:

Section 48(a)(8)[14] provides that the investment credit is not to be available as to property with respect to which the taxpayer has elected the benefits of certain 5-year depreciation or amortization provisions, as described in table I.

When the Congress first enacted the investment credit (by sec. 2 of the Revenue Act of 1962, Pub. L. 87–834, 76 Stat. 962, 970), section 48(g)[15] provided that the basis of section 38

---

SEC. 48. DEFINITIONS; SPECIAL RULES.
  (c) USED SECTION 38 PROPERTY.—

    *        *        *        *        *        *        *

    (3) DEFINITIONS.—For purposes of this subsection—

    *        *        *        *        *        *        *

    (B) COST.—The cost of used section 38 property does not include so much of the basis of such property as is determined by reference to the adjusted basis of other property held at any time by the person acquiring such property. If property is disposed of (other than by reason of its destruction or damage by fire, storm, shipwreck, or other casualty, or its theft) and used section 38 property similar or related in service or use is acquired as a replacement therefor in a transaction to which the preceding sentence does not apply, the cost of the used section 38 property acquired shall be its basis reduced by the adjusted basis of the property replaced. The cost of used section 38 property shall not be reduced with respect to the adjusted basis of any property disposed of if, by reason of section 47, such disposition involved an increase of tax or a reduction of the unused credit carrybacks or carryovers described in section 46(b).

[14]SEC. 48. DEFINITIONS; SPECIAL RULES.
  (a) SECTION 38 PROPERTY.—

    *        *        *        *        *        *        *

    (8) AMORTIZED PROPERTY.—Any property with respect to which an election under section 167(k), 169, 184, 187, or 188 applies shall not be treated as section 38 property. In the case of any property to which section 169 applies, the preceding sentence shall apply only to so much of the adjusted basis of the property as (after the application of section 169(f)) constitutes the amortizable basis for purposes of section 169.

  (Sec. 2112(a)(1), Tax Reform Act of 1976 (Pub. L. 94–455, 90 Stat. 1905), amended sec. 48(a)(8) by striking out the reference to sec. 169 and by deleting the last sentence; different limitations on the investment credit were adopted for facilities subject to sec. 169 (see table I on p. 437 *infra*.))

  (Sec. 1901(b)(11)(A), Tax Reform Act of 1976 (Pub. L. 94–455, 90 Stat. 1795), amended sec. 48(a)(8) by striking out the reference to sec. 187; sec. 1901(a)(31) of that act (90 Stat. 1769) repealed sec. 187.)

  (Sec. 315(c), Revenue Act of 1978 (Pub. L. 95–600, 92 Stat. 2829) amended sec. 48(a)(8) by adding a reference to sec. 191.)

[15]SEC. 48. DEFINITIONS; SPECIAL RULES.
  (g) ADJUSTMENTS TO BASIS OF PROPERTY.—

    (1) IN GENERAL.—The *basis* of any section 38 property *shall be reduced, for purposes of this subtitle other than this subpart*, [i.e., other than the subpart determining the computation of the investment credit] by an amount equal to 7 percent of the qualified investment as determined under section 46(c) with respect to such property.

    (2) CERTAIN DISPOSITIONS, ETC.—If the tax under this chapter is increased for any taxable year under paragraph (1) or (2) of section 47(a) or an adjustment in carrybacks or carryovers is made under paragraph (3) of such section, the basis of the property described

property—but not the basis for determining the investment credit—was to be reduced by 7 percent of the qualified investment in the property. This rule, differentiating investment credit basis from basis generally, was repealed by section 203(a)(1) of the Revenue Act of 1964 (Pub. L. 88–272, 78 Stat. 33).

The Tax Reform Act of 1976 (sec. 804(a), Pub. L. 94–455, 90 Stat. 1591, 1592) added section 48(k), relating to investment credit for movie and television films. Paragraph (4)(B)[16] of this provision differentiates investment credit basis from basis, generally, in the case of such property.

## 2. *Merchant Marine Act, 1936*

Section 607, MMA, as enacted in 1936, provided that any person entering into a contract for Federal operating-differential subsidies (essentially, in foreign trade) was to make deposits into a capital reserve fund and a special reserve fund. As so enacted, section 607(f), MMA (Pub. L. 74–835, 49 Stat. 2007), provided that earnings deposited into these funds were to "be exempt from all Federal taxes." This provision was modified in 1938 to add a sentence stating that earnings withdrawn from the special reserve fund were to be taxed "as if earned during the year of withdrawal." (Sec. 28, Pub. L. 75–704, 52 Stat. 961. This provision also redesignated sec. 607(f), MMA, as sec. 607(h), MMA.) Before 1970, the law was administered through a series of closing agreements with the small number of affected taxpayers, and on the basis that the law provided deferral, not permanent exemption.[17]

In 1970, the Congress decided to make "a tax deferred reserve fund" available in unsubsidized as well as subsidized

---

in such paragraph (1) or (2), as the case may be (immediately before the event on account of which such paragraph (1), (2), or (3) applies), shall be increased by an amount equal to the portion of such increase and the portion of such adjustment attributable to such property.
[Emphasis supplied.]

[16]SEC. 48. DEFINITIONS; SPECIAL RULES.

(k) MOVIE AND TELEVISION FILMS.—

\*        \*        \*        \*        \*        \*        \*

(4) PREDOMINANT USE TEST; QUALIFIED INVESTMENT.—In the case of any qualified film—

\*        \*        \*        \*        \*        \*        \*

(B) in determining qualified investment under section 46(c)(1), there shall be issued (in lieu of the basis of the property) an amount equal to the qualified United States production costs (as defined in paragraph (5)).

[17]H. Rept. 91–1073, at 45; S. Rept. 91–1080, at 41.

TABLE I

| Provision | Enacted by— | Disqualified from investment credit by— | Later history |
|---|---|---|---|
| Sec. 167(k) Low income rental housing | Tax Reform Act of 1969 | Revenue Act of 1971 | --- |
| Sec. 169 Pollution control equipment | do. | do. | Disqualification removed by Tax Reform Act of 1976.[1] |
| Sec. 184 Railroad rolling stock | do. | do. | --- |
| Sec. 187 Coal mine safety equipment | do. | do. | Provision repealed by Tax Reform Act of 1976. |
| Sec. 188 Child care facilities | Revenue Act of 1971 | do. | --- |
| Sec. 191 Historic structure rehabilitation | Tax Reform Act of 1976 | Revenue Act of 1978 | --- |

[1]The investment credit benefits were limited by sec. 2112(a)(2), Tax Reform Act of 1976 (Pub. L. 94–455, 90 Stat. 1905), which added sec. 46(c)(5). This limitation was, in turn, further modified by sec. 313(a), Revenue Act of 1978 (Pub. L. 95–600, 92 Stat. 2826), and by sec. 103(a)(3), Technical Corrections Act of 1979 [1980] (Pub. L. 96–222, 94 Stat. 209).

trade, and in certain types of trade in addition to foreign trade.[18] As part of the "expansion of the availbility of the tax deferral privilege," the 1970 Act "provides a more specific statutory framework for determining the tax status of deposits into and withdrawals from the fund,"[19] i.e., the taxpayer's capital construction fund, as authorized by the act.

Section 607(d), MMA,[20] provides that, for purposes of the Internal Revenue Code, the taxpayer generally is not to take into account income deposited into the capital construction fund and earnings of the fund.

Section 607(e), MMA, sets forth the three accounts that are to be maintained in the fund. In general, of the amounts contributed to the capital construction fund, (1) amounts that would have been excludable anyway (such as municipal bond interest) or deductible anyway (such as depreciation), become part of the *capital account*, (2) amounts that otherwise would have been taxed as long-term capital gain, become part of the *capital gain account*, and (3) amounts that otherwise would have been taxed as ordinary income or short-term capital gain, become part of the *ordinary income account*.

Section 607(g), MMA,[21] provides for the tax treatment of any

---

[18]H. Rept. 91–1073, at 43; S. Rept. 91–1080, at 39.

[19]H. Rept. 91–1073, at 47; S. Rept. 91–1080, at 43–44.

[20](d) Nontaxability for Deposits.

(1) For purposes of the Internal Revenue Code of 1954—

(A) taxable income (determined without regard to this section) for the taxable year shall be reduced by an amount equal to the amount deposited for the taxable year out of amounts referred to in subsection (b)(1)(A),

(B) gain from a transaction referred to in subsection (b)(1)(C) shall not be taken into account if an amount equal to the net proceeds (as defined in joint regulations) from such transaction is deposited in the fund,

(C) the earnings (including gains and losses) from the investment and reinvestment of amounts held in the fund shall not be taken into account,

(D) the earnings and profits of any corporation (within the meaning of section 316 of such Code) shall be determined without regard to this section, and

(E) in applying the tax imposed by section 531 of such Code (relating to the accumulated earnings tax), amounts while held in the fund shall not be taken into account.

(2) Paragraph (1) shall apply with respect to any amount only if such amount is deposited in the fund pursuant to the agreement and not later than the time provided in joint regulations.

[21](g) Tax Treatment of Qualified Withdrawals.

(1) Any qualified withdrawal from a fund shall be treated—

(A) first as made out of the capital account,

qualified withdrawal from the fund;[22] in general, it provides that the basis of the new or rebuilt vessel, barge, or container for which the withdrawal is made is to be reduced by the amount of qualified withdrawal for which the taxpayer had previously received a deduction or exclusion under section 607(d), MMA. In particular, if an amount withdrawn from a taxpayer's capital construction fund is used to acquire a qualified vessel, and if the withdrawal is treated as made out of the ordinary income account, then "the basis of such vessel * * * shall be reduced by an amount equal to such" withdrawal (sec. 607(g)(2), MMA).[23]

---

(B) second as made out of the capital gain account, and

(C) third as made out of the ordinary income account.

(2) If any portion of a qualified withdrawal for a vessel, barge, or container is made out of the ordinary income account, *the basis of such vessel,* barge, or container *shall be reduced* by an amount equal to such portion.

(3) If any portion of a qualified withdrawal for a vessel, barge, or container is made out of the capital gain account, the basis of such vessel, barge, or container shall be reduced by an amount equal to—

(A) Five-eighths of such portion, in the case of a corporation (other than an electing small business corporation, as defined in section 1371 of the Internal Revenue Code of 1954), or

(B) One-half of such portion, in the case of any other person.

(4) If any portion of a qualified withdrawal to pay the principal on any indebtedness is made out of the ordinary income account or the capital gain account, then an amount equal to the aggregate reduction which would be required by paragraphs (2) and (3) if this were a qualified withdrawal for a purpose described in such paragraphs shall be applied, in the order provided in joint regulations, to reduce the basis of vessels, barges, and containers owned by the person maintaining the fund. Any amount of a withdrawal remaining after the application of the preceding sentence shall be treated as a nonqualified withdrawal.

(5) If any property the basis of which was reduced under paragraph (2), (3), or (4) is disposed of, any gain realized on such disposition, to the extent it does not exceed the aggregate reduction in the basis of such property under such paragraphs, shall be treated as an amount referred to in subsection (h)(3)(A) which was withdrawn on the date of such disposition. Subject to such conditions and requirements as may be provided in joint regulations, the preceding sentence shall not apply to a disposition where there is a redeposit in an amount determined under joint regulations which will, insofar as practicable, restore the fund to the position it was in before the withdrawal.

[Emphasis supplied.]

[22] A "qualified withdrawal" is one made in accordance with the agreement establishing the capital construction fund, but only if the withdrawal is for a purpose specified in sec. 607(f), MMA.

[23] The committee reports (H. Rept. 91–1073, pp. 53–54; S. Rept. 91–1080, at 50–51) describe the situation as follows:

"*Tax treatment of qualified withdrawals.*—A qualified withdrawal from the fund is treated as coming first out of the capital account to the extent of the amounts in that account, second out of the capital gain account, and last out of the ordinary income account. The qualified withdrawals are to be treated as coming out of each account on a first-in-first-out basis, that is, the earliest deposits in each account are treated as the first withdrawal from the account.

Section 607(h), MMA, provides that a withdrawal which is not a qualified withdrawal is to be taxed in the year withdrawn, in accordance with the type of account from which the withdrawal is made, and with interest from the due date for income tax for the year the amount was deposited into the capital construction fund.

## B. Analysis

### 1. The Statutes

The amount of the investment credit (other requirements having been met) depends on basis. Sec. 46(a)(1)(A) (note 11 *supra*); sec. 46(c)(1)(A) (note 12 *supra*). Because of section 607(g)(2), MMA (note 21 *supra*), Zuanich's basis in the reel is zero. It follows that petitioners' investment credit is zero.

The Congress has understood that basis is critical to computation of the credit. When the Congress has wanted to depart from the general basis rules, it has done so. See original section 48(g) (note 15 *supra*), section 46(c)(1)(B) (note 12 *supra*), section 48(c)(3)(B) (note 13 *supra*), section 48(k)(4)(B) (note 16 *supra*). The Congress has not departed from the regular basis rules as to the matter before us.

In section 607(g), MMA, the Congress provided that, as applied to the instant case, Zuanich has a zero basis in the reel. This is so only because Zuanich purchased the reel entirely with funds coming from a qualified withdrawal from the ordinary income account of his capital construction fund.[24] Petitioners concede that this is so. Nothing in the

---

"When qualified withdrawals are made to purchase a vessel, barge, or container, the tax cost or basis of the vessel, etc., is to be reduced in any case where the withdrawal is considered as being from the capital gain account or the ordinary income account. To the extent a withdrawal is made from the ordinary income account, no basis or tax cost is assigned to the vessel, barge, or container. To the extent a qualified withdrawal is from the capital gain account, the basis assigned to the vessel, etc., is to be three-eighths of the amount withdrawn in the case of a corporation, or one-half of the amount withdrawn in the case of an individual. Making the basis adjustments on account of withdrawals from the capital gain account in this manner in effect expresses the capital gain income in its ordinary income equivalent for tax purposes. [Fn. ref. omitted.]"

[24]Note that if Zuanich's capital construction fund had included any nontax-deferred items, then these items would have been allocated to his capital account, his withdrawal would have been treated first as coming out of that account, his basis in the reel would have been undiminished, and petitioners would have been entitled to the full investment credit. Similarly, petitioners would have been entitled to a partial basis—and a partial credit—if Zuanich had long-term capital gain items in his fund. The instant case is in its present

statute or the legislative history suggests that the Congress enacted a bifurcated basis rule sub silentio, in contrast to its specific basis rules in other investment credit situations.[25]

Further, the Congress has not evidenced any intention that we should override its specific language in order to provide both the investment credit and Merchant Marine Act tax benefits in the case of qualified withdrawals from the ordinary income account of a capital construction fund. On the different occasions when the Congress has faced the question of whether the investment credit should be allowed together with other tax benefits, the Congress has come to different conclusions. In 1962, the Congress decided that taking the investment credit should preclude taking a portion of the depreciation otherwise allowable. In 1964, it changed its mind and no longer required a depreciation adjustment. (See text at note 15 *supra.*) In 1971, it provided that a choice of 5-year amortization or depreciation in five areas should preclude the investment credit. (See table I *supra.*) In 1976, it removed the total disqualification from the investment credit as to pollution control equipment, but replaced it with a different restrictive rule, which was further modified in 1978, and again in 1980. In 1976, it allowed the full investment credit for property subject to 5-year amortization for historical structure rehabilitation, but in 1978, it decided that an election of 5-year amortization for such property should preclude the investment credit. In short, there simply is no general policy evidenced by the Congress that should lead us to depart from the language used by the Congress in the case before us.

In analyzing the foregoing statutory scheme, we may appropriately adhere to the guidance of the Supreme Court (*United States v. Olympic Radio & Television*, 349 U.S. 232, 236 (1955)), as follows:

It may be that Congress granted less than some thought or less than was originally intended. We can only take the Code as we find it and give it as great an internal symmetry and consistency as its words permit. We would

---

posture only because (1) everything in Zuanich's capital construction fund was fully tax-deferred and allocated to his ordinary income account, and (2) the entire reel was paid for from "a qualified withdrawal * * * made out of the ordinary income account" (sec. 607(g)(2), MMA).

[25]Cf. *United Telecommunications, Inc. v. Commissioner*, 65 T.C. 278 (1975), Supplemental Opinion 67 T.C. 760 (1977), affd. 589 F.2d 1383 (10th Cir. 1978), discussed *infra.*

not be faithful to the statutory scheme, as revealed by the words employed, if we gave "paid or accrued" a different meaning for the purposes of § 122(d)(6) than it has in the other parts of the same chapter.

Our precedents, too, offer guidance in this area, as follows:

However, there is "no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." *United States* v. *Amer. Trucking Ass'ns.*, 310 U.S. 534, 543 (1940); *Silvio Gutierrez*, 53 T.C. 394, 400 (1969), affd. ____ F.2d ____ (C.A.D.C. 1971). Unless the language of the statute is plainly at variance with the legislative policy, we cannot look beyond the normal meaning of the words chosen by Congress. We cannot depart from the statutory language to effectuate what we may merely surmise was the congressional purpose. Cf. *General Electric Co.* v. *Burton*, 372 F.2d 108, 111 (C.A. 6, 1967). * * * [*Busse v. Commissioner*, 58 T.C. 389, 392 (1972), affd. 479 F.2d 1147 (7th Cir. 1973).]

In any event, it is well settled that "if Congress has made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators." *Rechner v. Commissioner*, 30 T.C. 186 (1958); *Barr v. United States*, 324 U.S. 83 (1945). [*Catterall v. Commissioner*, 68 T.C. 413, 422 (1977), affd. sub nom. *Vorbleski v. Commissioner*, 589 F.2d 123 (3rd Cir. 1978).]

Since the legislative history does not cause us to believe that the Congress intended "basis" in section 607(g)(2), MMA, to have a meaning different from "basis" in section 46(c)(1)(A) and since the Congress has not evidenced a consistent policy which would be thwarted by giving the words consistent interpretations,[26] we conclude that (1) Zuanich's basis in the reel is zero, (2) his qualified investment in the reel is zero, and (3) petitioners' investment credit on account of the reel is zero.

*2. The Cases*

In *Wolfers v. Commissioner*, 69 T.C. 975 (1978), the taxpayers' subchapter S corporation purchased an air-conditioning system and other equipment with funds paid under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970. We held that the Relocation Act pay-

---

[26]See R. Dickerson, The Interpretation and Application of Statutes 224 (1975), as follows:

"Because legal documents are for the most part nonemotive, it is presumed that the author's language has been used, not for its artistic or emotional effect, but for its ability to convey ideas. Accordingly, it is presumed that the author has not varied his terminology unless he has changed his meaning, and has not changed his meaning unless he has varied his terminology; that is, that he has committed neither "elegant variation" nor "utraquistic subterfuge." This is the rebuttable presumption of formal consistency. [Fn. refs. omitted.]"

ments consituted contributions to capital by nonshareholders and that the basis reduction rules of section 362(c)[27] applied. We then concluded (69 T.C. at 989–990) as follows:

> We hold, accordingly, that the only basis HLW has for depreciation purposes in its new improvements is the basis it had in the assets it lost. No new qualified investment, therefore, was made for investment tax credit purposes. Sec. 46(c)(1). Accordingly, we need not reach the issue whether certain new assets constitute section 38 property.

In *Anderson v. Commissioner*, 54 T.C. 1035 (1970), affd. 446 F.2d 672 (5th Cir. 1971), the taxpayers had sold production payments from oil and gas leases subject to a pledge that the amounts realized would be used to equip the wells. The amounts were so used and the taxpayers claimed the investment credit on their share of the equipment. The parties agreed that the taxpayers had no basis in the equipment for purposes of depreciation.

Respondent relied on paragraphs (a) and (b) of section 1.48–1, Income Tax Regs. The taxpayers argued that the regulations were contrary to the statute. We stated (54 T.C. at 1039) as follows:

> We do not believe that it is necessary to rely on respondent's regulations. While we reach the same result, the requirement that the petitioners have a tax basis or cost in the property stems, in our opinion, not from the

---

[27]SEC. 362. BASIS TO CORPORATIONS.

(c) SPECIAL RULE FOR CERTAIN CONTRIBUTIONS TO CAPITAL.—

(1) PROPERTY OTHER THAN MONEY.—Notwithstanding subsection (a)(2), if property other than money—

(A) is acquired by a corporation, on or after June 22, 1954, as a contribution to capital, and

(B) is not contributed by a shareholder as such, then the basis of such property shall be zero.

(2) MONEY.—Notwithstanding subsection (a)(2), if money—

(A) is received by a corporation, on or after June 22, 1954, as a contribution to capital, and

(B) is not contributed by a shareholder as such, then the basis of any property acquired with such money during the 12-month period beginning on the day the contribution is received shall be reduced by the amount of such contribution. The excess (if any) of the amount of such contribution over the amount of the reduction under the preceding sentence shall be applied to the reduction (as of the last day of the period specified in the preceding sentence) of the basis of any other property held by the taxpayer. The particular properties to which the reductions required by this paragraph shall be allocated shall be determined under regulations prescribed by the Secretary or his delegate.

(The subsequent amendment of this provision by sec. 1906(b)(13)[sic](A), Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1834, does not affect the instant case.)

definition of section 38 property but from provisions relating to the determination of the amount of the credit. Any depreciable property which otherwise meets the tests in section 48(a) would come within the broad definition of section 38 property. *However, unless the taxpayer also has a tax basis or cost in the property—an essential element for the allowance of depreciation—*whatever might be the taxpayer's interest in that property, an essential element for the allowance of the investment credit is also lacking. In this respect, the regulations are consistent with the statute. [Fn. ref. omitted; emphasis supplied.]

After analyzing the mechanics of the statute, we concluded (54 T.C. at 1040) as follows:

Without a basis in the property, there could be no "qualified investment." Applying the multiplier in section 46(c)(2) would produce a "zero" investment credit. It is thus clear that, as a prerequisite to the allowance of an investment credit, the taxpayer must have some "basis" or "cost," just as the taxpayer must have a "basis" or "cost" for purposes of obtaining a depreciation allowance.[4]

---

[4] An exception to this rule was provided for leased property in sec. 48(d).

The Court of Appeals, in affirming our decision, concluded that the regulations were valid (thereby precluding an investment credit for the taxpayers) and also concluded that our analysis was valid (again precluding an investment credit for the taxpayers).

In *Anderson,* this Court and the Court of Appeals both proceeded by analyzing the investment credit's requirement of "basis" as being the basis for depreciation, except where the Congress specifically provided otherwise (see our analysis in 54 T.C. at 1041–1042).

In *Millers National Insurance Co. v. Commissioner,* 54 T.C. 457 (1970), we were presented with the question of whether property used both in the underwriting activity and the investment activity of a mutual insurance company qualified in full for the investment credit. For the year before the Court (1962), underwriting income was not taxable. The Supreme Court had previously held that assets used in the underwriting activity were not depreciable because Congress intended to limit the deductions to expenses related to taxed income. *Rockford Life Ins. Co. v. Commissioner,* 292 U.S. 382 (1934). In *Millers National,* we concluded (54 T.C. at 458–459) as follows:

During 1962 petitioner, like the taxpayer in the foregoing case, was taxed on its investment income but not on its underwriting income. Since petitioner

was not entitled in 1962 to depreciation on assets used in its underwriting activities, concomitantly under the provisions of section 48 petitioner also should not be entitled in 1962 to an investment credit on those same assets. [Fn. ref. omitted.]

The property involved in *Wagensen v. Commissioner*, 74 T.C. 653 (1980) (the taxpayer's partnership's breeding livestock) would have been section 38 property if it had been depreciable. It would have been depreciable if it had not been included in inventory used to determine profits. We concluded (74 T.C. at 661) as follows:

because the cost of the breeding cattle was included in inventory and used to determine profits, the cattle are not depreciable, and petitioner is not entitled to an investment credit for them. See sec. 1.167(a)–6(b), Income Tax Regs. While this seems to be an unfortunate result, we see no alternative under the statute and regulations as they are written.

To the same effect is *Coca-Cola Bottling Co. of Baltimore v. United States*, 203 Ct. Cl. 18, 487 F.2d 528 (1973), in which the taxpayer sought the investment credit with respect to its investment in returnable glass bottles and cases. The Court of Claims held that the taxpayer's cost recovery method amounted to current expensing, and thus was not a method of depreciation. The Court of Claims relied (203 Ct. Cl. at 27–28, 487 F.2d at 533) on *Anderson* and *Millers National*, as follows:

In *Anderson*, depreciation was not allowable to the taxpayers because they had no basis in the oil well equipment, and in *Millers Nat'l Life Ins. Co.*, depreciation was not allowable to the taxpayer because the asset was used in the production of non-taxable underwriting income. The instant case is clearly analogous to the two aforementioned cases. Here depreciation is not allowable to the taxpayers because they elected instead to expense the bottles and cases.

One strong indication that Congress did not intend to allow the investment credit to taxpayers who recovered their cost by expensing rather than through some method of depreciation, is the fact that in 1962 and 1963, section 48(g) required taxpayers to reduce their depreciable basis in the investment credit property by the amount of investment credit. Obviously, such a basis adjustment could not be accomplished where taxpayer has written off the entire cost of the property since there would be no basis left to adjust. [Fn. ref. omitted.]

In each of the foregoing cases, the courts concluded that there was no basis for depreciation and so no investment credit. The reasons for the absence of a basis for depreciation varied from case to case, but the result—the link between

basis for depreciation and allowance of investment credit—was the same in all the cases.

In *United Telecommunications, Inc. v. Commissioner*, 65 T.C. 278 (1975), Supplemental Opinion 67 T.C. 760 (1977), affd. 589 F.2d 1383 (10th Cir. 1978), we upheld sections 1.46–3(c)(1) and 1.48–1(b)(4), Income Tax Regs., to the extent they provided that the investment credit basis of self-constructed property does not include depreciation sustained with respect to a constructing asset on which investment credit has been allowed. This limited departure from the regular basis rules as interpreted in *Commissioner v. Idaho Power Co.*, 418 U.S. 1 (1974), was justified on the grounds that it was specifically required by regulations and it was consistent with the Congress' evident intent to prevent a double allowance of investment credit. In contrast, the situation presented in the instant case involves neither a clear regulatory mandate nor a clear legislative intent to depart from depreciation basis in the case of adjustments required by section 607(g)(2), MMA. Also, the courts noted in *United Telecommunications* that the scheme of the regulations would, on the average, be likely to yield results similar to those which would follow from use of the recapture rules (of sec. 47) together with full basis; no such similarity of average results appears as a likely consequence of petitioners' proposal in the instant case.

In *United Telecommunications*, the majority of this Court read the regulations as requiring a further departure from the depreciation basis rules. The majority understood the regulations to provide that the investment credit basis of self-constructed property does not include depreciation sustained with respect to a constructing asset even if no investment credit has been allowed with respect to this constructing asset. The majority concluded that this latter departure from the depreciation basis rules was more than what was required by the Congress. The majority then invalidated the regulations to the extent they required this excessive departure from the depreciation basis rules. The concurring judges of this Court would have reached the same result in that case by reading the regulations more narrowly, that is, by reading them to require only so much departure from depreciation basis as was necessary to effect the Congress' purpose of prohibiting a

double investment credit. In affirming, the Court of Appeals tended to agree with the concurring judges of this Court.

*United Telecommunications*, then, illustrates that this Court (and the Court of Appeals for the Tenth Circuit) will depart from depreciation basis in investment credit situations not specifically called for by the statute only when the departure is plainly required by the regulations and necessary to effectuate the Congress' evident purpose. Even then, the departure will not be permitted beyond the extent necessary to effectuate the Congress' plain purpose. Thus, *United Telecommunications* is in harmony with the other cases discussed *supra*.

In contrast with *United Telecommunications*, no such justification for departure from depreciation basis appears in the instant case. We conclude that a basis for depreciation of zero leads to an investment credit of zero in the instant case.

Section 1.46–3(c)(1), Income Tax Regs.,[28] acknowledges that basis for investment credit purposes is to be determined under "the general rules for determining the basis." It then provides that investment credit basis "generally" is (1) cost, (2) unreduced by the pre–1964 section 48(g)(1) adjustment (see text at note 15 *supra*), and (3) unreduced by "any other adjustment to basis, such as that for depreciation," (4) but including "all items properly included by the taxpayer in the depreciable basis of the property." Nevertheless, the general rule does not cover every case. For example, pursuant to the third sentence of the regulation (as upheld in *United Telecommunications, Inc. v. Commissioner, supra*), the basis of a self-constructed asset, for investment credit purposes, does not include capital-

---

[28](c) *Basis or cost.* (1) The basis of any new section 38 property shall be determined in accordance with the general rules for determining the basis of property. Thus, the basis of property would generally be its cost (see section 1012), unreduced by the adjustment to basis provided by section 48(g)(1) with respect to property placed in service before January 1, 1964, and any other adjustment to basis, such as that for depreciation, and would include all items properly included by the taxpayer in the depreciable basis of the property, such as installation and freight costs. However, for purposes of determining qualified investment, the basis of new section 38 property constructed, reconstructed, or erected by the taxpayer shall not include any depreciation sustained with respect to any other property used in the construction, reconstruction, or erection of such new section 38 property. (See paragraph (b)(4) of sec. 1.48–1.) If new section 38 property is acquired in exchange for cash and other property in a transaction described in section 1031 in which no gain or loss is recognized, the basis of the newly acquired property for purposes of determining qualified investment would be equal to the adjusted basis of the other property plus the cash paid. See sec. 1.48–4 for the basis of property to a lessee where the lessor has elected to treat such lessee as a purchaser.

ized depreciation on the constructing assets. Also, the next-to-last sentence of the regulation specifies a basis adjustment that is to be taken into account—that under section 1031. In addition, we have held that the basis adjustment required by section 362(c) is to be given effect for the investment credit. *Wolfers v. Commissioner, supra.*

The regulation provides a general rule. It also provides a number of specific rules, some of which may be modifications of the general rule. Nothing in the regulation indicates an intention to deal specifically with the section 607(g)(2), MMA, adjustment to basis. In *Wolfers*, we followed the general rule as to basis. In the instant case, we follow the general rule as to basis.

We conclude that the regulation does not purport to, and is not intended to, provide a rule requiring us to ignore the Congress' command in section 607(g)(2), MMA.

## C. The Court of Claims Decisions

Petitioners argue that the reasoning in *Pacific Far East Line, Inc. v. United States*, 211 Ct. Cl. 71, 544 F.2d 478 (1976), is "decisive in this case." We disagree with the reasoning of the Court of Claims in *Pacific Far East Line* and the other Court of Claims decisions reaching the same result.

*Pacific Far East Line* involved ships placed in service in 1962. The ships were paid for in part out of withdrawals from the taxpayer's reserve funds allocated to tax-deferred earnings. Pursuant to a closing agreement, the taxpayer's bases in the ships were reduced by the amounts of the respective withdrawals.

The Court of Claims in *Pacific Far East Line* emphasized an investment credit legislative history "special reference to regulated industries and that the major purpose was to reduce the cost of acquiring new equipment." The Court of Claims stated that the reference to regulated industries "should not be considered lightly" and deemed it "very material in the discussion to follow." (211 Ct. Cl. at 82, 544 F.2d at 483–484.) The Court of Claims concluded that the amount of the taxpayer's "qualified investment" in the vessel was its cost to the taxpayer, reasoning that section 1012 and sections 1.46–3(c) and 1.1012–1, Income Tax Regs., defined cost as "the amount of money * * * paid to acquire the property, whatever

the source of the money." The Court of Claims stressed (211 Ct. Cl. 84, 544 F.2d at 485) that the legislative history of the 1962 Act has "no reference to whether the funds spent as part of the 'cost' of the property had their source in untaxed income. The cost of property to the taxpayer is the amount of money that he paid to acquire the property, whatever the source of the money." The Court of Claims then maintained that the amount of the investment credit would not be affected by whether the taxpayer's funds to acquire the property came from borrowing, gifts, interest earned on tax-exempt municipal bonds, income earned abroad on which the foreign tax credit eliminated the Federal income tax, or retirement income subject to a retirement income credit. (211 Ct. Cl. at 84, 544 F.2d at 485.) The Court of Claims found no reason to reduce basis for purposes of the investment credit, stating that to do so would violate the congressional purpose underlying the investment tax credit. (211 Ct. Cl. at 85, 544 F.2d at 486.) The Court of Claims then analyzed and rejected an argument, based on section 1.48–1(b)(2), Income Tax Regs., that to the extent vessels were acquired with tax-free amounts from the fund, they were not "section 38 property" because no depreciation was allowable under the closing agreement (211 Ct. Cl. at 88, 544 F.2d at 486–487),[29] and concluded that the closing agreement, by its own terms, did not determine basis for investment tax credit purposes. (211 Ct. Cl. 88–93, 544 F.2d at 487–490).[30]

The issue presented in *Pacific Far East Line* was again faced by the Court of Claims in *Oglebay Norton Co. v. United States*, 221 Ct. Cl. 749, 610 F.2d 715 (1979); the only significant difference between the cases was that in the latter case the

---

[29]Respondent maintains "that the Court of Claims incorrectly interpreted Congress' intent." However, respondent does not rely on, or even cite, the regulations thus dealt with by the Court of Claims. Under these circumstances, we do not believe any useful purpose would be served by analyzing these regulations. See *Anderson v. Commissioner*, 54 T.C. 1035, 1039 (1970).

[30]In *Pacific Transport Co. v. United States*, 211 Ct. Cl. 99, 544 F.2d 493 (1976), *Delta Steamship Lines, Inc. v. United States*, 211 Ct. Cl. 104, 544 F.2d 496 (1976), and *Moore McCormack Resources, Inc. v. United States*, an unreported order (Ct. Cl. 1980, 46 AFTR 2d 80–5075, 80–2 USTC par. 9495), the Court of Claims held as it did in *Pacific Far East Line* for the reasons set forth in *Pacific Far East Line*.

basis adjustment, rather than being based on a provision in a closing agreement, was set forth in section 607(g)(2), MMA.

Most of the opinion of the Court of Claims in *Oglebay Norton* tracks the opinion in *Pacific Far East Line*, quoting from it extensively; the *Oglebay Norton* opinion states that section 607(g), MMA, merely codifies the previous arrangements reached in the closing agreements. (221 Ct. Cl. at ____ , 610 F.2d at 723.) Finding that the 1970 Act was not intended to change the tax rules that had applied previously, the Court of Claims decided that the same result should be reached in *Oglebay Norton* as had been reached in *Pacific Far East Line.* (221 Ct. Cl. at ____ , 610 F.2d at 726–727.) The Court of Claims allowed the investment credit, as it had in *Pacific Far East Line.*[31]

We are unable to agree with the reasoning of the Court of Claims. First, the Court of Claims' approach that the basis adjustment of section 607(g)(2), MMA, is not taken into account for investment tax credit purposes conflicts with the principle that one gives to the words in a statute their ordinary meaning unless, for example, something in the legislative history or the regulations justifies doing otherwise; as explained in preceding portions of this opinion, no such justification exists.

Second, the Court of Claims' reliance on congressional intent is unpersuasive, because the legislative history gives no indication that the Congress focused on the interrelationship between the Merchant Marine Act and the investment credit in 1962 or 1971. When the Congress did focus on the relationship between the investment credit and other provisions of the tax laws, it sometimes chose to allow both the investment credit and the other special treatment, but also it sometimes chose to disallow one or the other benefit. The Congress may have thought highly of the investment credit, but it hedged the provisions about with great numbers of restrictions. It is not for us (or for respondent, qua litigant) to

---

[31]In *O. L. Schmidt Barge Lines, Inc. v. United States,* 221 Ct. Cl. 793, 610 F.2d 728 (1979), and *Gilman v. United States,* an unreported order (Ct. Cl. 1980, 45 AFTR 2d 80–782, 80–1 USTC par. 9244), the Court of Claims held as it did in *Oglebay Norton* for the reasons set forth in *Oglebay Norton.* In *Ness v. United States,* an unreported order (Ct. Cl. 1980, 45 AFTR 2d 80–784, 80–1 USTC par. 9243), the Court of Claims followed *Gilman.*

question the wisdom of the Congress in establishing the investment credit[32] (see *Tipps v. Commissioner,* 74 T.C. 458, 472 (1980)), nor is it for us (or petitioners, qua litigants) to question the wisdom of the restrictions on the investment credit. As to the Congress' intent, it seems clear that the Congress intended to condition the amount of the investment credit on the amount of the taxpayer's basis; also, it intended to reduce the taxpayer's basis in an asset to the extent the taxpayer used capital construction fund tax-deferred withdrawals to acquire this asset.

Third, in analyzing the effect of source of funds, the Court of Claims ignores two related matters. Firstly, the Congress chose to make the amount of the credit depend on basis, and those sources of funds which are cited by the Court of Claims (borrowing, gifts, etc.) do not affect basis. Secondly, in contrast, in the case of capital construction funds, the Congress specifically required the basis adjustment that has given rise to the dispute. Indeed, the Court of Claims implicitly conceded that a congressionally mandated basis reduction outside the investment credit area would be given effect in the investment credit area (211 Ct. Cl. at 85–86, 544 F.2d at 486), as follows:

Outside the sections dealing with the credit, nevertheless, incorporated into the investment credit provisions by sec. 1012 via sec. 46(c)(1) and regulations thereunder, sec. 362(c)(2) provides that if money is contributed to a corporation by a non-stockholder, any basis of property acquired within one year with such money shall be reduced by the amount of the contribution.[33] In the absence of such expressed provision, Congress must have intended that the basis be the full amount of the moneys invested, undiminished by reason of events involved in the taxpayer's acquisition of the moneys.

In *Pacific Far East Line,* the Court of Claims ignored the specific congressional action in the 1970 Act, presumably because the case before it involved 1962. In *Oglebay Norton,* the Court of Claims held that the 1970 Act was of no significance because it merely codified the prior practice as to closing agreements. The result of this "end-around" play is to

[32]Or in suspending it (1966), reinstating it (1967), repealing it (1969), resurrecting it (1971), enhancing it (1975), or otherwise modifying it almost every year.

[33]In this pronouncement, the Court of Claims foreshadowed our opinion in *Wolfers v. Commissioner,* 69 T.C. 975 (1978).

ignore the fact that, with respect to capital construction funds after the Merchant Marine Act of 1970, the Congress mandated just the sort of basis-adjustment rule depending on source of funds to which the Court of Claims said it would give effect.

Fourth, we fail to understand the Court of Claims' emphasis on the 1962 Act legislative history language dealing with regulated industries. Evidently, the reference to regulated industries that the Court of Claims quotes (from H. Rept. 87–2508 (Conf.), at 14 (1962), 1962–3 C.B. 1142) was merely setting to rest the dispute that had surfaced earlier as to whether rate-regulated public utilities should be entitled to any investment credit at all. See General Explanation of Committee Discussion Draft of Revenue Bill of 1961, Released for Information and Study, August 24, 1961, at 9 (Sept. 29, 1961);[34] H.Rept. 87–1447 (Revenue Act of 1962), at 8, 1962–3 C.B. 412.[35] The dispute was resolved by allowing rate-regulated public utilities of the sort specified in detail in the statute to secure the benefits of the investment tax credit with respect to their "public utility property," but only at three-sevenths of the level of benefits available to other taxpayers.[36] There is no indication that the properties involved in either *Pacific Far East Line* or the instant case constitute "public utility property." Consequently, the 1962 Act legislative history reference to regulated industries appears to be of no special significance to the situation we face in the instant case.

---

[34]"(2) Property which is used in a public utility trade or business. Public utility for this purpose refers to the furnishing or sale of electrical energy, gas, water, or sewage disposal services or telephone or telegraph service. These types of businesses are excluded [from the proposed investment credit] only if the rates for the furnishing or sale of the services are established or approved by a governmental unit."

[35]"The investment credit in the case of most *regulated public utilities* is in effect 4 percent rather than 8 percent. The smaller credit is provided in such cases because much of its benefit in *these regulated industries* is likely to be passed on in lower rates to consumers, thereby negating much of the stimulative effect on investments. Moreover, the size of the investment in *regulated public utilities*, such as electric companies, local gas companies, telephone companies, etc., will in large part be determined by the growth of other industries, rather than their own. [1962–3 C.B. 412. Emphasis supplied.]"

[36]This compromise was embodied in sec. 46(c)(3), as originally enacted by sec. 2(b), Revenue Act of 1962 (Pub. L. 87–834, 76 Stat. 965). When the previously repealed investment credit was resurrected in 1971, the compromise was modified to allow four-sevenths of the regular credit. (Sec. 105(a), Revenue Act of 1971, Pub. L. 92–178, 85 Stat. 503.) In 1975, public utilities became entitled to the full increased investment credit. (Sec. 301(b)(1), Tax Reduction Act of 1975 (Pub. L. 94–12, 89 Stat. 36.))

Fifth, we fail to understand the Court of Claims' emphasis on the 1962 Act legislative history language describing the investment credit as producing a net reduction in cost of assets. This is the view of the investment credit that led the Congress to enact old section 48(g) (see note 15 *supra*), which reduced the depreciation basis of the asset by the amount of the investment credit.[37] However, this provision was repealed by the Revenue Act of 1964. In the Revenue Act of 1971, the Congress treated the investment credit as a reduction in the cost of the asset for purposes of one alternative restriction on flow-through of the credit to customers of rate-regulated utilities, but treated it as a reduction in tax liability for purposes of another alternative restriction.[38]

In its work on the Revenue Act of 1971, the Congress understood that most businesses treated the credit as a reduction in tax liability and not as a reduction in cost of the asset.[39] In order to forestall attempts to require businesses to

---

[37]The Senate Finance Committee report on the Revenue Act of 1962 stated (S. Rept. 87–1881, at 12, 1962–3 C.B. 718) as follows:

"Despite the substantial similarity of your committee's and the House versions of the investment credit, there are important differences. The most important of these is the reduction of the amount on which depreciation may be taken, in the case of assets eligible for the investment credit, by the amount of the investment credit allowable. Your committee believes that where a taxpayer purchases a $100 asset, for example, if $7 of this purchase price is to be allowed as a direct reduction in his tax in the form of a credit, this same amount should not be allowed to him again as a depreciation deduction in computing income subject to tax. In such a case the taxpayer's real contribution toward the purchase of the $100 property is limited to $93 and therefore it seemed appropriate to your committee to limit the depreciation recovery to this same $93."

The House accepted this Senate amendment. H. Rept. 87–2508, at 14 (1962), 1962–3 C.B. 1142.

[38]The cost reduction approach was embodied in sec. 46(e)(1) and the tax reduction approach in sec. 46(e)(2), as enacted by the Revenue Act of 1971, redesignated as secs. 46(f)(1) and 46(f)(2), respectively, by the Tax Reduction Act of 1975, modified by the Revenue Act of 1978, and further modified by the Technical Corrections Act of 1979 [1980].

[39]In the Senate floor debate on this provision, Senator Bennett had printed in the Congressional Record (Nov. 15, 1971, 117 Cong. Rec. S41327) a letter from Charls E. Walker, then Acting Secretary of the Treasury, stating in part as follows:

"For financial accounting purposes, companies previously have had the option of either—(1) treating the credit as an immediate reduction in tax liability in the year the assets are acquired, when the credit is allowed; or (2) spreading the benefit of the credit over the service life of the asset as if the credit, in effect, was a reduction in the cost of the asset.

"The vast majority of the companies have followed the former alternative—reflecting the benefit of the credit immediately in earnings. It seems self-evident that these businessmen will have less motivation to purchase new equipment if the benefits of the credit are not reflected in operating results when realized, as they have been in the past in their case."

treat the credit as a cost reduction,[40] the Congress enacted section 101(c) of the Revenue Act of 1971.[41] This provision established a Federal neutrality in the dispute between the concepts of tax reduction and cost reduction. It does not appear that there is any special significance, for purposes of the instant case, to the 1962 Act legislative history references to the investment credit as a reduction in cost.

## D.  Effect  of  Section  46(g)

As a final matter, we will deal with respondent's contentions regarding the significance of the Congress' action in 1976, in adding subsection (g) to section 46 (sec. 805(a) of the Tax

[40]The Senate Finance Committee report stated (S. Rept. 92–437, at 45 (1971), 1972–1 C.B. 584) as follows:

"*11. Accounting for the investment tax credit*

"The procedures employed in accounting for the investment credit in financial reports to shareholders, creditors, etc., can have a significant effect on reported net income and thus on economic recovery. The committee, as was the House, is concerned that the investment credit provided by the bill have as great a stimulative effect on the economy as possible. Therefore, from this standpoint it would appear undesirable to preclude the use of "flow through" in the financial reporting of net income.

"If the investment credit is thought of as decreasing the price of the equipment purchased, it can be argued that reflecting the benefit of the credit in income over the life of the asset is appropriate. However, the investment credit may also be thought of as a selective tax rate reduction applicable in those cases where the desired investments are being made. In this latter event, it is difficult to see why the current "flow through" should be prevented in the financial reporting of income."

[41]The conferees described their general agreement with the Senate amendment (S. Rept. 92–553, at 33 (1971), 1972–1 C.B. 656) as follows:

"Accounting for Investment Credit in Financial Reports

"Amendment No. 7: The Senate amendment provides that, for purposes of accounting for the investment credit in financial reports, no taxpayer shall be required to use any particular method of accounting. The amendment also requires taxpayers to disclose in their financial reports, the method of accounting used for the investment credit.

"The House recedes with an amendment. The conference agreement clarifies the application of the Senate amendment by providing that taxpayers for purposes of reporting to Federal agencies and for purposes of making financial reports subject to regulation by Federal agencies are to be permitted to account for the tax benefit of the investment credit either currently in the year in which the investment credit is taken as a tax reduction, or ratably over the life of the asset. This includes not only reports made to the Federal Government, but also reporting to stockholders to the extent any Federal agency has the authority to specify the method of such reporting. This treatment is to be available notwithstanding any other law or regulation under law. The method used after the date of the bill must be consistently followed unless permission to make a change in the method of reporting is obtained from the Secretary or his delegate. The requirements set forth in this provision are not to apply to reports of public utilities for which other rules are provided under section 105 of the bill."

Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1596). In general, section 46(g) "provides for an investment credit of one-half the regular credit on the tax-deferred amounts withdrawn from the capital construction fund which are used to purchase qualified vessels." (S. Rept. 94–1236 (Conf.), at 447 (1976), 1976–3 C.B. (Vol. 3) 851. See Joint Committee on Taxation, 94th Cong., 2d Sess., General Explanation of the Tax Reform Act of 1976, at 187, 1976–3 C.B. (Vol. 2) 199.) On brief, respondent analyzes section 46(g) and its legislative history, and concludes as follows:

> We make two points. First, statutory law as it currently reads does not allow the full credit for amounts withdrawn under MMA. Secondly, the pertinent legislative history described above states that Congress did not contemplate the interplay between depreciation and the investment credit. At the very least, then, the effect of Congressional intent on the instant issue has been fully neutralized, thereby undercutting the principal support cited by the Court of Claims for its decision in *Pacific Far East Line, supra.* That decision no longer represents sound authority. The law, we think, is quite clear. Prior to January 1, 1976, no investment credit was allowable with respect to the nondepreciable property purchased under MMA. *Code* sec. 48(a)(1).

Although we agree with respondent's conclusions in the instant case, we disagree with his reading of the significance of the enactment of section 46(g). As the portions of section 46(g) set forth in the margin[42] make clear, the Congress decided to temporize as to the future. The half-credit rule referred to *supra* is merely a "floor" (in the present context, a more felicitous term may be "safe harbor"). The courts are to decide whether more than half is available without considering the enactment of section 46(g). In order to make more plain the

---

[42]Sec. 46(g) provides, in pertinent part, as follows:

SEC. 46. AMOUNT OF CREDIT.

(g) 50 PERCENT CREDIT IN THE CASE OF CERTAIN VESSELS.—

\*      \*      \*      \*      \*      \*      \*

(3) COORDINATION WITH SECTION 38.—The amount of the credit allowable by reason of this subsection with respect to any property shall be the minimum amount allowable under section 38 with respect to such property. If, without regard to this subsection, a greater amount is allowable under section 38 with respect to such property, then such greater amount shall apply and this subsection shall not apply.

\*      \*      \*      \*      \*      \*      \*

(6) NO INFERENCE.—Nothing in this subsection shall be construed to infer that any property described in this subsection is or is not section 38 property, and any determination of such issue shall be made as if this subsection had not been enacted.

mission of the courts, the conferees' Joint Explanatory Statement on the Tax Reform Act of 1976 (S. Rept. 94–1236 (Conf.), at 448 (1976), 1976–3 C.B. (Vol. 3) 852 (see Joint Committee General Explanation 188, 1976–3 C.B. (Vol. 2) 200)), concludes on this provision as follows:

> The conference agreement applies to taxable years beginning after December 31, 1975. This is not intended to provide any inference as to the application of existing law with respect to the availability of the credit for prior (as well as future) years.

From the foregoing, we conclude that the Congress has instructed us not only to ignore the text of section 46(g) but also to treat the matter before us as though section 805 of the Tax Reform Act of 1976 had never been proposed, reported, described, or amended in the course of the Congress' consideration of the Tax Reform Act of 1976.

On the investment credit issue, also, we hold for respondent. Accordingly,

*Decision will be entered for the respondent.*

Reviewed by the Court.

GOFFE, *J.*, concurring in part and dissenting in part: I fully concur with the majority as to the foreign tax credit issue but respectfully dissent as to the investment credit issue. I would, instead, reach the result reached by the Court of Claims in the following eight cases: *Pacific Far East Line, Inc. v. United States*, 211 Ct. Cl. 71, 544 F.2d 478 (1976); *Pacific Transport Co. v. United States*, 211 Ct. Cl. 99, 544 F.2d 493 (1976); *Delta Steamship Lines, Inc. v. United States*, 211 Ct. Cl. 104, 544 F.2d 496 (1976); *Oglebay Norton Co. v. United States*, 221 Ct. Cl. 749, 610 F.2d 715 (1979); *O. L. Schmidt Barge Lines, Inc. v. United States*, 221 Ct. Cl. 793, 610 F.2d 728 (1979); *Ness v. United States*, an unreported case (Ct. Cl. 1980, 45 AFTR 2d 80–784, 80–1 USTC par. 9243); *Gilman v. United States*, an unreported case (Ct. Cl. 1980, 45 AFTR 2d 80–782, 80–1 USTC par. 9244; *Moore McCormack Resources, Inc. & Consolidated Subsidiaries v. United States*, an unreported order (Ct. Cl. 1980, 46 AFTR 2d 80–5075, 80–2 USTC par. 9495).

The majority in the instant case strains to divine the intent of Congress as to whether the investment credit should be

allowed for the qualified investment in a fishing reel which is paid for from a Merchant Marine Act (MMA) capital construction fund ordinary income account. Yet the majority traces the legislative history of the investment credit and the MMA and virtually concedes that Congress never contemplated the MMA when it enacted the investment credit provisions and never contemplated the investment credit provisions when it enacted the MMA. In 1976, when Congress finally saw fit to coordinate the investment credit provisions with the MMA provisions, it made clear that no inference was to be drawn as to the availability of the investment credit for prior years. Conferees' Joint Explanatory Statement on the Tax Reform Act of 1976 (S. Rept. 94–1236 (Conf.), at 448 (1976), 1976–3 C.B. (Vol. 3) 852 (Joint Committee General Explanation 188, 1976–3 C.B. (Vol. 2) 200)).

Although there is no congressional intent as to the relationship of the investment credit and the MMA, there is a widely understood congressional intent as to the investment credit and there is an independent widely understood congressional intent as to the MMA.

It matters not whether the congressional purpose of the investment credit is viewed as a reduction of the cost of the asset or as a reduction of the taxpayer's income tax because the overall purpose of its enactment was to encourage the acquisition of qualified assets by the taxpayer. The effect of the holding of the majority is to charge petitioner with a higher cost for acquiring the fishing reel or to increase his tax liability by denying the investment credit because he used his MMA account instead of purchasing the fishing reel directly.

Petitioner's investment in the fishing reel falls squarely within the intent of Congress. Only the timing is off. Instead of directly acquiring the qualified asset for cash, he acquired it in two stages. First, he made deposits into an MMA capital construction fund ordinary income account. He parted with actual cash to make these deposits. It is true that he was allowed to deduct these amounts under the MMA, but when he acquired the reel he was deprived of the depreciation deduction to offset his deductions for contributions to the MMA account. Nevertheless he made a net outlay of cash to acquire a new asset qualifying for the investment credit. He should,

therefore, be entitled to the investment credit for the qualified investment he has made.

The independent congressional intent as to the MMA is expressed solely in denying a deduction for depreciation of assets purchased from funds in the ordinary income account. Petitioner falls squarely within the prohibition of a depreciation deduction on the fishing reel because he purchased it from the ordinary income account. The income tax consequences to a taxpayer of utilizing the MMA capital construction fund ordinary income account are fully and completely spelled out in the MMA provisions. If a taxpayer was allowed a deduction when he contributed money to the fund, he cannot later benefit from a depreciation deduction on an otherwise depreciable asset purchased from the MMA fund.

In an attempt to interject the MMA provisions into the investment credit provisions, the majority upsets the neat and tidy symmetry of the MMA by constructing an intent of Congress unsupported by any legislative history contrary to the stated purpose of the investment credit.

The enactment of an investment tax credit was first proposed by President Kennedy in 1961.[1] Congress considered the President's proposals, but did not enact the credit in 1961. It was not until 1962 that the Kennedy administration and Congress moved in concert to enact the investment tax credit provisions.

In his economic report to Congress, President Kennedy reiterated his desire that Congress enact the proposed investment tax credit, saying:

In particular, I urge the earliest possible enactment of the tax proposals now before the House Committee on Ways and Means. The centerpiece of these proposals is the 8 percent tax credit against tax for gross investment in depreciable machinery and equipment. * * * The tax credit increases the profitability of productive investment by reducing the net cost of acquiring new equipment. *It will stimulate investment in capacity, expansion and modernization, contribute to the growth of our productivity and output, and increase the competitiveness of American exports in world markets.* [Economic Report to Congress, Jan. 22, 1962, 108 Cong. Rec. 584. Emphasis added.]

[1]Message from President Kennedy to Congress, Apr. 20, 1961, 107 Cong. Rec. 6376 (1961).

Obviously, President Kennedy perceived the purpose of the investment tax credit to be that of encouraging investment in productive assets by reducing the net cost thereof.

The legislative intent of Congress is as follows:

Realistic depreciation alone, however, is not enough to provide either the essential economic growth or to permit American industry to compete on an equal basis with the rapidly growing industrial nations of the free world. The major industrialized nations of the free world today provide not only liberal depreciation deductions but also initial allowances or incentive allowances to encourage investment and economic growth. This is true, for example, in Belgium, Canada, France, West Germany, Italy, Japan, the Netherlands, Sweden, and the United Kingdom.

*The investment credit will stimulate investment because—as a direct offset against the tax otherwise payable—it will reduce the cost of acquiring depreciable assets.* This reduced cost will stimulate additional investment since it increases the expected profit from their use. The *investment credit will also encourage investment because it increases the funds available for investment.* [H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 405, 412. Emphasis supplied.]

Realistic depreciation alone, however, is not enough to provide the essential economic growth. In addition, a specific incentive must be provided if a higher rate of growth is to be achieved. *The investment credit will stimulate investment,* first by reducing the net cost of acquiring depreciable assets, which in turn increases the rate of return after taxes arising from their acquisition. Second, investment decisions are also influenced by the availability of funds. The credit *by increasing the flow of cash available for investment, will stimulate investment.* The increased cash flow will be particularly important for new and smaller firms which do not have ready access to the capital markets. Third, the credit can be expected to stimulate investments through a reduction in the "payoff" period for investment in a particular asset. This reduction in risk, coupled with the higher rate of profitability and increased cash flow, will lower the level at which decisions to invest are made and will help to restore to past levels the proportion of the annual national output devoted, through investment in machinery and equipment, to capital formation.

The objective of the investment credit is to encourage modernization and expansion of the Nation's productive facilities and thereby improve the economic potential of the country, with a resultant increase in job opportunities and betterment of our competitive position in the world economy. The objective of the credit is to reduce the net cost of acquiring new equipment; this will have the effect of increasing the earnings of new facilities over their productive lives and increasing the profitability of productive investment. It is your committee's intent that the financial assistance represented by the credit should itself be used for new investment, thereby further advancing the economy. Only in this way will the investment credit fully serve the overall national interest in greater productivity, a healthy and sustained economic growth, and a better balance in international payments.

[S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 707, 717. Emphasis added.]

It is the understanding of the conferees on the part of both the House and the Senate that the purpose of the credit for investment in certain depreciable property, in the case of both regulated and nonregulated industries, is to encourage modernization and expansion of the Nation's productive facilities and to improve its economic potential by reducing the net cost of acquiring new equipment, thereby increasing the earnings of the new facilities over their productive lives. [Conf. Rept. 2508, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 1129, 1142.]

One can hardly dispute the conclusion that Congress enacted the investment tax credit in order to encourage investment in new equipment.

In reality, the investment tax credit is a Government subsidy or, in the parlance of academia, a "tax expenditure." See Surrey, "Tax Incentives as a Device for Implementing Government Policy: A Comparison with Direct Government Expenditures," 83 Harv. L. Rev. 705 (1970). Congress has decreed that the U.S. Government will, through the vehicle of the investment tax credit, help investors buy a specified percentage of certain kinds of assets. As distinguished from the provisions for the deduction of depreciation, which deductions are allowed primarily for the purpose of charging the costs of producing income against the income produced by those costs, i.e., the matching principle, the investment tax credit provides a one-time subsidy that is intended to *reduce the net cost*, at the outset, of investing in certain assets. So, it would appear that if an asset is of the kind specified by Congress, then the purchaser should, absent a specific exception, receive the benefit of the subsidy.

As we conclude our examination of the intent with which Congress enacted the investment credit, we would note that the investment tax credit provisions are to be interpreted liberally in keeping with their purposes. *United Telecommunications, Inc. v. Commissioner*, 65 T.C. 278, 289 (1975), affd. 589 F.2d 1383 (10th Cir. 1978), cert. denied 442 U.S. 917 (1979); *Minot Federal Savings & Loan Assn. v. United States*, 435 F.2d 1368, 1372 (8th Cir. 1970); *Northville Dock Corp. v. Commissioner*, 52 T.C. 68, 73 (1969).

The MMA was enacted in 1936 to promote the American merchant marine at a time when shipping constructed during World War I was becoming obsolete. The investment incentive

with which we are here concerned is the capital construction fund provisions of section 607 of the MMA. This portion of the MMA, as it existed during the years here relevant, allowed a U.S. citizen who owned or leased an eligible vessel to enter into an agreement with the Secretary of Commerce to establish a capital construction fund with respect to any or all of such vessels.[2] Such agreements are to be for the purposes of providing replacement vessels, additional vessels, or reconstructed vessels, subject to certain limitations not here relevant.[3] The agreements, in order to effectuate the goal of providing funds for future qualified withdrawals, are to provide for yearly deposits in the fund of agreed-upon amounts, such amounts not to exceed 50 percent of the taxpayer's taxable income (as computed under other provisions of the MMA) which is attributable to the operation of the vessels encompassed by the terms of the agreement.[4] Section 607(b) of the MMA provides certain ceiling limitations on the amounts which may be deposited in the fund. Section 607(c) of the MMA places restrictions on where the assets in the fund may be deposited and in what they may be invested.

Section 607(e) of the MMA sets forth the three types of accounts that are to be maintained in the fund, the distinction in the accounts being the source of the income which is deposited into each of them. We are here concerned only with the "ordinary income account" defined in section 607(e)(4) of the MMA. This account basically includes amounts deposited therein which had their origin in ordinary income-type transactions of the depositing taxpayer, especially "amounts referred to in subsection (b)(1)(A),"[5] which are defined as:

(A) that portion of the taxable income of the owner or lessee for such year (computed as provided in chapter 1 of the Internal Revenue Code of 1954 [26 U.S.C. sec. 1 et seq.] but without regard to the carryback of any net operating loss or net capital loss and without regard to this section) which is attributable to the operation of the agreement vessels in the foreign or domestic commerce of the United States or in the fisheries of the United States.

---

[2]Sec. 607(a), Merchant Marine Act, 1936.
[3]Sec. 607(a), MMA.
[4]Sec. 607(a), MMA.
[5]Sec. 607(e)(4)(A), MMA.

Qualified withdrawals from the fund can be made only for:

(A) The acquisition, construction, or reconstruction of a qualified vessel,

(B) The acquisition, construction, or reconstruction of barges and containers which are part of the complement of a qualified vessel, or

(C) The payment of the principal on indebtedness incurred in connection with either (A) or (B), above.[6]

Qualified withdrawals are treated as first coming out of the other two accounts in the fund, and then as coming out of the ordinary income account.[7] However, in the present case, we have only an ordinary income account with which to deal.

That completes a summary of the mechanics of establishing an account, making deposits thereto, and withdrawing funds therefrom. It is the remaining provisions of the MMA that provide the inducement to engage in those exercises.

Section 607(d)(1)(A) of the MMA provides that a taxpayer's taxable income for the taxable year in which he makes a deposit to a fund shall be reduced by an amount equal to the amount deposited for the taxable year out of amounts referred to in subsection (b)(1)(A) (which amounts are, as we noted earlier, amounts out of the taxable income of the taxpayer (as computed under that subsection) which is attributable to the operation of vessels in the foreign or domestic commerce of the United States or in the fisheries of the United States). In other words, a taxpayer may deduct amounts derived from the ordinary income of his fishing or shipping business which he deposits in a capital construction fund ordinary income account. However, this deduction does not result in a permanent exclusion of such amounts from the taxpayer's income. Sec. 607(g)(2) of the MMA provides that:

(2) if any portion of a qualified withdrawal for a vessel, barge, or container is made out of the ordinary income account, the basis of such vessel, barge, or container shall be reduced by an amount equal to such portion.

In effect, the amount deducted in the year of withdrawal is restored to income in the years that the taxpayer's deprecia-

---

[6]Sec. 607(f)(1), MMA.

[7]Sec. 607(g)(1), MMA.

tion deductions under section 167 are reduced because of the reduced basis mandated by section 607(g)(2) of the MMA. This mechanism provides a tax deferral, not a tax exclusion.[8] The intent of Congress is amply illustrated by the language in the following excerpts from a committee report:

> Three separate accounts are to be maintained in the fund according to the nature of the deposits: the capital account, the capital gain account, and the ordinary income account. Withdrawals may be from the fund and without payment of tax for the purpose of acquiring vessels used in foreign trade, in the Great Lakes trade, in the noncontiguous domestic trade, or the fisheries. These amounts, however (to the extent taken from the ordinary income account or to some extent in the case of withdrawals from the capital gains account), *reduce the basis for computing depreciation on the vessels built with withdrawals from the fund.* * * * [S. Rept. 91–1080, at 40, to accompany H.R. 15424 (Pub. L. 91–469, 84 Stat. 1018 (1970). Emphasis added.]
>
> When these assets are withdrawn from the fund for use to build vessels, however, the basis of the vessels *for depreciation purposes* is reduced to the extent tax-deferred earnings or capital gain were used to finance it. [S. Rept. 91–1080, *supra* at 41.]

The independent legislative objectives behind the investment credit and the MMA can thus be summarized: (1) Congress intended to subsidize the purchase of productive assets which meet the requirements of the investment tax credit statutes; and (2) the basis reduction that is mandated by section 607(g)(2) of the MMA was enacted solely to complete the tax deferral scheme found in section 607 of the MMA and was, therefore, designed to reduce a vessel's basis only for purposes of depreciation. Since Zuanich's reel seems to be the type of property in which Congress desired to encourage investment, I believe that the legislative goals of Congress would be best attained by construing these two statutory provisions in such a way that the investment tax credit is available under these facts. By limiting the application of section 607(g)(2) of the MMA to its intended scope, i.e., the reduction of a vessel's basis solely for purposes of depreciation, the intent of Congress with regard to the availability of the investment tax credit in this context will not be thwarted.

---

[8] A further tax incentive is found in the portion of the MMA which excludes from a taxpayer's gross income any income realized from the investment and reinvestment of amounts held in the fund. Sec. 607(d)(1)(C), MMA.

The majority indulges in the kind of legislative construction which the Supreme Court condemned in *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84 (1934), where the Court said:

The intention of the lawmaker controls in the construction of taxing acts as it does in the construction of other·statutes, and that intention is to be ascertained, not by taking the word or clause in question from its setting and viewing it apart, but by considering it in connection with the context, the general purposes of the statute in which it is found, the occasion and circumstances of its use, and other appropriate tests for the ascertainment of the legislative will * * * [293 U.S. at 93.]

Even after the majority attempts to support a phantom legislative intent by comparing the situation here with other situations where Congress manifested such an intent, it painstakingly takes the reader through the investment credit provisions (which were never intended by Congress to relate to the MMA) but overlooks a basis provision which effectively excludes the MMA from the investment credit provisions. The majority concludes that petitioner's basis is zero but fails to point out the general provision that basis is cost. Section 1012 defines "basis" as follows:

The basis of property shall be the cost of such property, except as otherwise provided in this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses). The cost of real property shall not include any amount in respect of real property taxes which are treated under section 164(d) as imposed on the taxpayer.

The adjustment to basis which the majority interjects is not embodied by the unmistakable specific language of section 1012. It is derived from the Merchant Marine Act, 46 U.S.C. sec. 1177. The plain words of section 1012 define basis as cost. Moreover, petitioner has a cost in the fishing reel. His cost is reflected in the cash he deposited into the MMA account and then later withdrew to purchase the fishing reel.

Moreover, the regulations which relate to the investment credit refer to section 1012. Section 1.46–3(c)(1), Income Tax Regs., provides in part as follows:

. (c) *Basis or Cost.* (1) The basis of any new section 38 property shall be determined in accordance with the *general rules* for determining the basis of property. Thus, the *basis of property would generally be its cost* (see section 1012), *unreduced by* the adjustment to basis provided by section 48(g)(1) with respect to property placed in service before January 1, 1964, and *any other adjustment to basis*, such as that for depreciation * * * [Emphasis supplied.]

The adjustment to basis required by section 607(g)(2) of the MMA could hardly be classified as part of the "general rules" for determining basis referred to by the regulations. Furthermore, the regulations provide that basis for purposes of the investment credit be determined *before* any adjustments to basis. The reduction in basis to zero made by the majority in its opinion by reason of the MMA is certainly an adjustment to basis. The majority, contrary to the regulations quoted above, denies the investment credit by reducing the basis and applying the investment credit *after* the adjustment to basis.

The majority attempts to support its conclusion as to congressional intent by relying on cases in which the taxpayer had no cost in the asset. In the instant case, petitioner incurred a cost in acquiring the asset.

In *Anderson v. Commissioner*, 54 T.C. 1035 (1970), affd. 446 F.2d 672 (5th Cir. 1971), taxpayers who owned partial interests in some oil and gas leases, sold a production payment to a third party with the proceeds from the sale being pledged to equip oil and gas wells on the leases. The reality of such transactions is that the "purchaser" of the production payment has invested funds in the development of the leases in exchange for an interest in the property. See G.C.M. 22730, 1941–1 C.B. 214. The assignors in such a case are denied any depreciation with regard to property purchased with such funds, inasmuch as they have not invested any money therein. See G.C.M. 24849, 1946–1 C.B. 66. The taxpayers/assignors in the *Anderson* case claimed the investment credit on the assets purchased with the funds provided by the third party/assignee. Since, under the law of oil and gas taxation, the taxpayer/assignors are not treated as having invested in such assets, we held that they are not entitled to the investment credit for such assets. Petitioners argued that the regulations were contrary to the statute and should not be followed by the Court.

We held that it was not necessary to rely upon the regulations but held, instead, that petitioners had no investment in the assets and, therefore, the property did not fall within the general definition of section 38 property. We held, further, that the taxpayer must have incurred a cost for the property to be eligible for depreciation and for the investment credit, and in that respect, the regulations were consistent with the statute. That case, however, involved only the

question of whether the taxpayer made an investment in the property. It is undisputed that petitioner in the instant case made an investment in the property.

The United States Court of Appeals for the Fifth Circuit affirmed *Anderson v. Commissioner, supra.* It, too, decided the case on the ground that the taxpayers had not made an investment in the subject property:

The taxpayers made no investment in the equipment obtained pursuant to this transaction which would entitle them to a return of capital through the depreciation deduction. The assignee, * * * and not the taxpayers, provided the funds for the equipment. [446 F.2d at 672, 673.]

The court, however, affirmed based upon our opinion.

In *Millers National Insurance Co. v. Commissioner*, 54 T.C. 457 (1970), we were presented with the question of whether property used both in the underwriting activity and the investment activity of a mutual insurance company qualified in full for the investment credit. At that time, underwriting income was not taxable. The Supreme Court previously held that assets used in the underwriting activity were not depreciable because Congress intended to limit the deductions to expenses related to taxed income. *Rockford Life Ins. Co. v. Commissioner*, 292 U.S. 382 (1934). We held that because the taxpayer was not entitled to depreciation on the assets, it was not entitled to the investment credit on them. In the instant case, there is no compelling reason to deny "section 38 property" status to Zuanich's fishing reel. As stated above, it is clearly tangible personal property of a depreciable character with at least a 3-year useful life, which is all that the relevant statute requires. Since Zuanich is seeking the investment credit for property that was undisputedly purchased with his own investment funds, the prohibition found in the *Anderson* case is inapplicable. Finally, because the income from Zuanich's fishing business is generally subject to the Federal income tax, there is no danger of a nontaxable business providing tax benefits to a taxable business of the same taxpayer and, therefore, the rationale of the *Millers National Ins. Co.* case is not relevant in this case.

I, therefore, disagree with the holding of the majority and would allow petitioner the investment credit for the fishing reel he acquired. Legislative intent fabricated by the majority as to the interplay of the investment credit and the MMA is

woven out of whole cloth and that unsupported intent violates the avowed intent of Congress as to the investment credit and the avowed intent of Congress as to the Merchant Marine Act.

IRWIN, HALL, WILES, and NIMS, *JJ.*, agree with this concurring and dissenting opinion.